UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

W.S.R., *an infant by and through his father*
WILLIAM RICHARDSON, WILLIAM
RICHARDSON, *and* NICOLE RICHARDSON,

                                       Plaintiffs,

        v.

FCA US, LLC, YANFENG US AUTOMOTIVE
INTERIOR SYSTEM II LLC (A/K/A/
YANFENG AUTOMOTIVE INTERIOR
SYSTEMS), ADIENT PLC, JOHNSON
CONTROLS, INC., *and* JCIM, LLC,

                                     Defendants.

No. 18-CV-6961 (KMK)

---

FCA US, LLC,

                         Third-Party Plaintiff,

        v.

YANFENG US AUTOMOTIVE INTERIOR
SYSTEM II LLC (A/K/A/ YANFENG
AUTOMOTIVE INTERIOR SYSTEMS),
ADIENT PLC, JOHNSON CONTROLS, INC.,
*and* JCIM, LLC,

                         Third-Party Defendants.

OPINION & ORDER

---

Appearances:

Yitzchak M. Fogel, Esq.
Danielle George, Esq.
Phillips & Paolicelli, LLP
New York, NY
*Counsel for Plaintiffs*

Jessica Leigh Gross, Esq.
Kennedys LLP
Basking Ridge, NJ
*Counsel for Defendant and Third-Party Plaintiff FCA US LLC*

Maureen Doerner Fogel, Esq.
Herzfeld & Rubin, P.C.
New York, NY
*Counsel for Defendant and Third-Party Plaintiff FCA US LLC*

Carl L. Steccato, Esq.
Katherine Garcia, Esq.
Wood Smith Henning & Berman
New York, NY
*Counsel for Defendant Yanfeng US Automotive Interior Systems II (a/k/a/ Yangfeng Automotive Interior Systems)*

John P. Mitchell, Esq.
Faegre Drinker Biddle & Reath LLP
Princeton, NJ
*Counsel for Defendants and Third-Party Defendants Adient PLC, Johnson Controls, Inc., and JCIM, LLC*

KENNETH M. KARAS, District Judge:

W.S.R. ("W.S.R."), an infant by and through his father William Richardson, William Richardson ("William"), and Nicole Richardson ("Nicole"; collectively, "Plaintiffs") bring this Action against FCA US LLC ("FCA"), Yanfeng US Automotive Interior Systems II (a.k.a. Yanfeng Automotive Interior Systems) ("YFAI"), Adient PLC ("Adient"), Johnson Controls, Inc. ("Johnson Controls"), and JCIM, LLC ("JCIM"; with Adient and Johnson Controls, "AJJ"; altogether, "Defendants"), sounding in products liability and personal injury following an automobile accident. (*See generally* Third Am. Compl. ("TAC") (Dkt. No. 161).) Defendants have filed a series of counterclaims sounding in indemnification and contribution. (*See* Dkt. Nos. 172, 174, 176.)

Before the Court are several motions for summary judgment: 1) AJJ's Motion for Summary Judgment against Plaintiffs; 2) Plaintiffs' Motion for Summary Judgment against all

Defendants, as well as a separate claim against FCA; 3) FCA's Motion for Summary Judgment against YFAI, 4) YFAI's Motion for Summary Judgment against FCA and Plaintiffs; 5) AJJ's Motion for Summary Judgment against FCA; and 6) AJJ's Motion for Summary Judgment against YFAI.  (*See* AJJ's Not. of Mot. for Summ. J. ("AJJ's Pls. Not. of Mot.") (Dkt. No. 227); Pls.' Not. of Mot. for Summ. J. ("Pls.' Not. of Mot.") (Dkt. No. 226); FCA's Not. of Mot. for Summ. J. ("FCA's Not. of Mot.") (Dkt. No. 239); YFAI's Not. of Mot. for Summ. J. ("YFAI's Not. of Mot.") (Dkt. No. 250); AJJ's Not. of Mot. for Summ. J. ("AJJ's YFAI Not. of Mot.") (Dkt. No. 233); AJJ's Not. of Mot. for Summ. J. ("AJJ's FCA Not. of Mot.") (Dkt. No. 236).) For the following reasons, AJJ's Motion against Plaintiffs is granted, Plaintiffs' Motion is granted in part and denied in part, FCA's Motion is denied, and YFAI's Motion is denied.[1]

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically:

- AJJ's 56.1 Statement in Support of its Motion regarding Plaintiffs' Claims (AJJ.'s Local Civil Rule 56.1 Statement in Supp. of AJJ Mot. on Pls.' Claims ("AJJ's Pls. 56.1") (Dkt. No. 227-2));

- Plaintiffs' 56.1 Statement in Support of their Motion regarding Defendants' Claims (Pls.' Local Civil Rule 56.1 Statement in Supp. of Pls.' Mot. ("Pls.' 56.1") (Dkt. No. 232);

- AJJ's 56.1 Statement in Support of its Motion regarding YFAI's Crossclaims (AJJ.'s Local Civil Rule 56.1 Statement in Supp. of AJJ Mot. on YFAI.'s Crossclaims ("AJJ's YFAI 56.1") (Dkt. No. 233-2));

---

[1] The Court declines to rule on AJJ's Motions for Summary Judgment against FCA and YFAI as AJJ is no longer a party to the litigation.

- AJJ's 56.1 Statement in Support of its Motion regarding FCA's Crossclaims (AJJ.'s Local Civil Rule 56.1 Statement in Supp. of AJJ Mot. on FCA's Crossclaims ("AJJ's FCA 56.1") (Dkt. No. 236-2));

- YFAI's 56.1 Statement in Support of its Motion regarding Plaintiffs' Claims (YFAI's Local Civil Rule 56.1 Statement in Supp. of YFAI Mot. on Pls.' Claims ("YFAI's 56.1") (Dkt. No. 237-2));

- FCA's 56.1 Statement in Support of its Motion regarding Plaintiffs' Claims (FCA's Local Civil Rule 56.1 Statement in Supp. of FCA Mot. on Pls.' Claims ("FCA's 56.1") (Dkt. No. 242));

- FCA's Response to Plaintiffs 56.1 Statement (FCA's Response to Pls.' Rule 56.1 Statement ("FCA's Resp. to Pls.' 56.1") (Dkt. No. 266));

- FCA's Response to YFAI's 56.1 Statement (FCA's Response to YFAI's Rule 56.1 Statement ("FCA's Resp. to YFAI's 56.1") (Dkt. No. 276));

- FCA's Response to AJJ's 56.1 Statement (FCA's Response to AJJ's Rule 56.1 Statement ("FCA's Resp. to AJJ's 56.1") (Dkt. No. 292));

- Plaintiffs' Response to YFAI's 56.1 Statement (Pls.' Response to YFAI's Rule 56.1 Statement ("Pls.' Resp. to YFAI's 56.1") (Dkt. No. 304));

- Plaintiffs' Response to AJJ's 56.1 Statement (Pls.' Response to AJJ's Rule 56.1 Statement ("Pls.' Resp. to AJJ's 56.1") (Dkt. No. 306));

- AJJ's Response to Plaintiffs' 56.1 Statement (AJJ's Response to Pls.' Rule 56.1 Statement ("AJJ's Resp. to Pls.' 56.1") (Dkt. No. 312));

- AJJ's Response to FCA's 56.1 Statement (AJJ's Response to FCA's Rule 56.1 Statement ("AJJ's Resp. to FCA's 56.1") (Dkt. No. 314));

- YFAI's Response to Plaintiffs' 56.1 Statement (YFAI's Response to Pls.' Rule 56.1 Statement ("YFAI's Resp. to Pls.' 56.1") (Dkt. No. 316));

- YFAI's Response to AJJ's 56.1 Statement (YFAI's Response to AJJ's Rule 56.1 Statement ("YFAI's Resp. to AJJ's 56.1") (Dkt. No. 319)); and,

- YFAI's Response to FCA's 56.1 Statement (YFAI's Response to FCA's Rule 56.1 Statement ("YFAI's Resp. to FCA's 56.1") (Dkt. No. 322)).[2]

---

[2] AJJ submitted multiple reply statements of fact (purportedly) pursuant to Local Civil Rule 56.1, replying to all others Parties' statements of fact in response to AJJ's initial undisputed statements of fact. (*See* Dkt. Nos. 336-1 (replying to Plaintiffs' response to AJJ's Rule 56.1

Additionally, where appropriate, the Court cites directly to the admissible evidence submitted by the Parties.  The facts as described below are in dispute to the extent indicated.

---

statement); 340-1 (replying to FCA's response to AJJ's Rule 56.1 statement); 344-1 (replying to YFAI's response to AJJ's Rule 56.1 statement).)

"Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts" but also "does not prohibit such replies."  *Cap. Rec., LLC v. Vimeo, LLC*, No. 09-CV-10101, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 7, 2018).  Absent explicit guidance in the local rules, "[c]ourts in this District have concluded that a reply Rule 56.1 statement constitutes 'a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules.'"  *Mayagüez S.A. v. Citibank, N.A.*, No. 16-CV-6788, 2022 WL 901627, at *9 (S.D.N.Y. Mar. 25, 2022) (quoting *G.S. v. Pleasantville Union Free Sch. Dist.*, No. 19-CV-6508, 2020 WL 4586895, at *1 n.2 (S.D.N.Y. Aug. 10, 2020)).

Accordingly, courts provided such filings have regularly disregarded them.  *See, e.g., Julian v. MetLife, Inc.*, No. 17-CV-957, 2021 WL 3887763, at *6 (S.D.N.Y. Aug. 31, 2021) (granting a motion to strike), *leave to appeal denied sub nom. McKinney v. Metro. Life Ins. Co.*, No. 21-2209, 2021 WL 7451180 (2d Cir. Dec. 21, 2021); *Roth v. Cheesecake Factory Restaurants, Inc.*, No. 19-CV-6570, 2021 WL 1103505, at *2 (S.D.N.Y. Feb. 5, 2021) (considering only facts asserted in response to new facts raised in the non-movant's response), *report and recommendation adopted*, 2021 WL 912416 (S.D.N.Y. Mar. 10, 2021); *Cunningham v. Cornell Univ.*, No. 16-CV-6525, 2019 WL 4735876, at *1 n.3 (S.D.N.Y. Sept. 27, 2019) ("The [c]ourt will not consider . . . [the] [d]efendants' [r]eply except to the extent it responds to new facts . . .");  *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *3 (E.D.N.Y. Feb. 1, 2019) (concluding that "the [c]ourt declines to consider the Reply Rule 56.1 Statement, except to the extent it responded to [] new facts"), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).  In the alternative, at least one court in this district has permitted non-movants to submit a "reply in further support . . . or a sur-reply to [that] reply" so as to alleviate this procedural impropriety.  *Cap. Rec.*, 2018 WL 4659475, at *1.

AJJ cites *one* case from a decade ago arising from a different district to justify its submission.  (*See* AJJ's Reply to Pls.' Rule 56.1 Statement 1 (Dkt. No. 336-1) (citing *Skoczylas v. United States*, 906 F. Supp. 2d 161, 165 n.3 (E.D.N.Y. 2012)).)  *Skoczylas* states only:  "Although Local Civil Rule 56.1 does not require a reply statement of facts by the movant, it also does not forbid it.  Therefore, the [c]ourt will consider reply statements of facts."  906 F. Supp. 2d at 165.  In other words, the court did not engage in exhaustive analysis as to whether considering such statements was permissible.  Moreover, that case has only been cited once, and it was not for the proposition that Rule 56.1 Replies are permissible.  *See United States v. Gray*, No. 08-CV-244, 2013 WL 2470303, at *9 (E.D.N.Y. June 7, 2013) (citing *Skoczylas* regarding the merits of the case).

Ultimately, the Court agrees with Judge Seibel:  "The Court is capable of determining whether [the non-movant] improperly disputed a fact without needing [the movant] to file a procedurally improper document explaining as much."  *G.S.*, 2020 WL 4586895, at *1.  Thus, the Court will not consider AJJ's reply statements.

1.  The Parties

"FCA is a global manufacturer of automobiles," (Pls.' 56.1 ¶ 45; FCA's Resp. to Pls.'
56.1 ¶ 45) and "its principal place of business [is] in Auburn Hill, Michigan."  (FCA's Resp. to
Pls.' 56.1 ¶ 45.)

In 2014, Johnson Controls and Yanfeng Automotive Trim Systems Co., Ltd. "agreed to
create a joint venture contributing their respective interior automotive product businesses."
(AJJ'S YFAI 56.1 ¶ 8; YFAI's Resp. to AJJ's 56.1 ¶ 8.)  On April 10, 2015, [Yanfeng
Automotive Trim Systems Co., Ltd.] and [Johnson Controls] signed an Amended Master
Agreement ("MA") forming [] YFAI as the joint venture company, which closed on July 2,
2015[.]"  (AJJ'S YFAI 56.1 ¶ 9; YFAI's Resp. to AJJ's 56.1 ¶ 9.)

On July 2, 2015, Johnson Controls "entered into a joint venture with . . . Yanfeng
Automotive Trim Systems Co., Ltd., to form YFAI."  (FCA's 56.1 ¶ 9; YFAI's Resp. to FCA's
56.1 ¶ 9.)  Pursuant to Section 9 of the agreement creating the joint venture, "YFAI agreed to
indemnify and hold harmless [Johnson Controls] for 'any and all [c]osts incurred by [Johnson
Controls] arising out of, relating to or resulting from [YFAI's] [a]ssumed [l]iabilities,' including
third party claims."  (AJJ'S YFAI 56.1 ¶ 10; YFAI's Resp. to AJJ's 56.1 ¶ 10.)  Pursuant to the
MA, "[e]ffective July 2, 2015, [Johnson Controls] gave YFAI all its open contracts with FCA
including working on the [2017 Chrysler Pacifica instrument panel], including [Purchase Order]
4820005."  (FCA's 56.1 ¶ 10; YFAI's Resp. to FCA's 56.1 ¶ 10.)[3]

---

[3] AJJ seemingly takes issue with FCA's factual pronouncements, though the precise
nature of the dispute is unclear, asserting that "YFAI *took over*" the work pursuant to the
contracts rather than such contracts being given.  (AJJ's Resp. to FCA's 56.1 ¶ 10 (emphasis
added).)  Again, the Court reads AJJ's dispute of this factual assertion as semantic in nature,
meaning the Court will admit this fact.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No.
18-CV-6712, 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) (collecting cases) ("Where

2.  The Events Giving Rise to this Cause of Action

On June 24, 2018, W.S.R. was nine years old and at home with his parents, William and

Nicole Richardson.  (*See* Pls.' 56.1 ¶¶ 18–19; FCA's Resp. to Pls.' 56.1 ¶¶ 18–19; AJJ's Resp. to

Pls.' 56.1 ¶¶ 18–19.)  William and Nicole Richardson owned a 2017 Chrysler Pacifica minivan

("RU"),[4] VIN number 2C4RC1EG8HR513511, which was parked in their driveway on the top

of a hill.  (*See* Pls.' 56.1 ¶¶ 20–21; FCA's Resp. to Pls.' 56.1 ¶¶ 20–21; AJJ's Resp. to Pls.' 56.1

¶¶ 20–21.)

After accidentally opening the car's hood, W.S.R. then opened the manual parking

release ("MPR") plug, or "cover"; however, the Parties dispute how W.S.R. did—or could

have—done so.  (*See* Pls.' 56.1 ¶¶ 27–30; FCA's Resp. to Pls.' 56.1 ¶¶ 27–30; AJJ's Resp. to

Pls.' 56.1 ¶¶ 27–30.)  Irrespective of how this was achieved, by opening the MPR cover, W.S.R.

saw and pulled what he referred to as an "orange string," which prompted the car to begin rolling

backwards.  (*See* Pls.' 56.1 ¶¶ 31–32; FCA's Resp. to Pls.' 56.1 ¶¶ 31–32; AJJ's Resp. to Pls.'

56.1 ¶¶ 31–32.)  Subsequently, W.S.R. got out and went to the back of the car, trying to push it

in order to stop it from rolling; however, the car "rolled over W.S.R. and down the driveway

until it crashed into an electrical box."  (Pls.' 56.1 ¶¶ 33–34; FCA's Resp. to Pls.' 56.1 ¶¶ 33–34;

AJJ's Resp. to Pls.' 56.1 ¶¶ 33–34.)  As a result, W.S.R. sustained injuries, though the Parties

dispute the extent of the injuries.  (*See* Pls.' 56.1 ¶ 39; FCA's Resp. to Pls.' 56.1 ¶ 39; AJJ's

Resp. to Pls.' 56.1 ¶ 39.)

---

the Parties identify disputed facts but with semantic objections only or by asserting irrelevant
facts, [the Court will not consider] these purported disputes, which do not actually challenge the
factual substance described in the relevant paragraphs, . . . as creating disputes of fact.").  Thus,
the Court deems this fact admitted.

    [4] (*See* FCA's 56.1 § Definitions, Abbreviations, And Acronyms; YFAI's Resp. to FCA's
56.1 § Definitions, Abbreviations, And Acronyms.)

A first responder that entered the car after the incident found the car in "Neutral," as did

the police.  (*See* Pls.' 56.1 ¶¶ 36, 40; FCA's Resp. to Pls.' 56.1 ¶¶ 36, 40; AJJ's Resp. to Pls.'

56.1 ¶¶ 36, 40.)

Notably, a similar incident occurred in which another young boy seemingly inadvertently

hit the MPR cover, causing a similar rolling of a different 2017 Chrysler Pacifica.  (*See* Pls.' 56.1

¶¶ 73–100; FCA's Resp. to Pls.' 56.1 ¶¶ 73–100; AJJ's Resp. to Pls.' 56.1 ¶¶ 73–100; YFAI's

Resp. to Pls.' 56.1 ¶¶ 73–100.)[5]

### 3.  Vehicle Production and Relevant Contracts

FCA is the manufacturer of the 2017 Chrysler Pacifica.  (FCA's 56.1 ¶ 6; YFAI's Resp.

to FCA's 56.1 ¶ 6.)  More specifically, "FCA built the [] RU VIN 2C4RC1EG8HR513511 in

May[] 2016."  (FCA's 56.1 ¶ 7; AJJ's Resp. to FCA's 56.1 ¶ 7; YFAI's Resp. to FCA's 56.1 ¶

7.)[6]  Importantly, "FCA built the [the car by] incorporating a steering column cover and MPR

---

[5] The Parties dispute the admissibility of this incident.  (*See* Pls.' 56.1 ¶¶ 73–100; FCA's
Resp. to Pls.' 56.1 ¶¶ 73–100; AJJ's Resp. to Pls.' 56.1 ¶¶ 73–100; YFAI's Resp. to Pls.' 56.1 ¶¶
73–100.)  Specifically, FCA contends that much of the discussion is "offered for the truth of the
matter asserted" and thus inadmissible "hearsay."  (FCA's Resp. to Pls.' 56.1 ¶¶ 76–88, 90–94.)
This is incorrect.  "The statement at issue is not hearsay since [P]laintiffs did not seek to offer it
to prove the truth of the matter asserted therein, namely, that [P]laintiff [W.S.R.] . . . suffered [an
injury].  Rather, it was offered to demonstrate . . . an element of [P]laintiffs' cause of action,"
namely the existence of FCA's duty to mitigate such accidents from occurring in the future.
*Giardino v. Beranbaum*, 720 N.Y.S.2d 3, 4 (App. Div. 2001) (citations omitted); *cf. U.S. v.
Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (noting that "a statement offered to show its effect on
the listener is not hearsay"); *Shafii v. PLC Brit. Airways*, 22 F.3d 59, 65 (2d Cir. 1994) ("The
statements are not offered for the truth of the matter asserted but for the fact that they had
occurred.").

[6] YFAI does not specifically admit this fact; indeed, it often leaves such facts
unremarked.  In other words, YFAI, fails to dispute it.  As a result, "the Court deems [it] . . . as
admitted."  *Mason Tenders Dist. Council Welfare Fund v. Gibraltar Contracting, Inc.*, No. 18-
CV-3668, 2020 WL 230603, at *5 n.6 (S.D.N.Y. Jan. 14, 2020) (citing Local Civ. R. 56.1(c));
*see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party
[] fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be
deemed admitted.").

cover supplied to it by defendant YFAI."  (FCA's 56.1 ¶ 110; AJJ's Resp. to FCA's 56.1 ¶ 110;

YFAI's Resp. to FCA's 56.1 ¶ 110.)

### a.  The FCA/Johnson Controls Letter of Intent

On January 30, 2014, FCA entered into a Letter of Intent ("LOI") with Johnson Controls

"whereby [Johnson Controls] would perform ED&D [('engineering design and development')]

on the RU IP [('instrument panel')]."  (FCA's 56.1 ¶ 17; AJJ's Resp. to FCA's 56.1 ¶ 17;

YFAI's Resp. to FCA's 56.1 ¶ 17).  Johnson Controls accepted the LOI by performing work on

the relevant purchase order after January 30, 2014.  (FCA's 56.1 ¶ 28; AJJ's Resp. to FCA's 56.1

¶ 28; YFAI's Resp. to FCA's 56.1 ¶ 28.)

"The LOI is subject to Chrysler's Production and Mopar Purchasing General Terms and

Conditions ('General T&Cs')."  (FCA's 56.1 ¶ 19; AJJ's Resp. to FCA's 56.1 ¶ 19; YFAI's

Resp. to FCA's 56.1 ¶ 19.)[7]  At the time of the LOI, the 09/2010 version of the General T&Cs

were in effect.  (FCA's 56.1 ¶ 20; AJJ's Resp. to FCA's 56.1 ¶ 20; YFAI's Resp. to FCA's 56.1

¶ 20.)  This iteration of the General T&Cs includes an insurance and indemnification clause.

(*See* YFAI's 56.1 ¶ 15–16; Pls.' Resp. to YFAI's 56.1 ¶ 15–16; FCA's Resp. to YFAI's 56.1 ¶

15–16.)

The insurance clause reads:

Insurance. Seller will obtain and continuously maintain in force during the Term (i)
statutory worker's compensation insurance, (ii) employer's liability insurance, (iii)
commercial general liability insurance, including contractual liability and products
and completed operations liability, (iv) automobile liability insurance, including

---

[7] AJJ takes issue with the use of present tense in this factual assertion, arguing that "[t]he
LOI was intended as a placeholder agreement which would be superseded by a subsequent
purchase order."  (AJJ's Resp. to FCA's 56.1 ¶ 19.)  But "[w]here the Parties identify disputed
facts but with semantic objections only or by asserting irrelevant facts, [the Court will not
consider] these purported disputes, which do not actually challenge the factual substance
described in the relevant paragraphs, . . . as creating disputes of fact."  *Arch Specialty*, 2021 WL
1225447, at *1 n.1.  Accordingly, the Court deems this fact admitted.

owned, hired and non-owned liability, (v) crime insurance, including employee theft, and (vi) all-risk property insurance covering Seller's property, including Tooling and Unpaid Tooling and all Chrysler property, raw materials and finished products, including Bailed Property and Chrysler Tooling, while in Seller's possession or in Seller's care, custody and control, all in amounts and coverages sufficient to cover all claims hereunder. Such policies will name Chrysler as an additional insured thereunder; be primary and not excess over or contributory with any other valid, applicable, and collectible insurance in force for or maintained by Chrysler; and provide that the insurer will give Chrysler thirty days prior written notice of cancellation or material change in coverage. Seller waives, and Seller will cause its insurers to waive, any right of subrogation or other recovery against Chrysler or its subsidiaries, including their respective employees, officers, directors, agents or representatives. Chrysler may require Seller to furnish evidence of the foregoing insurance, but Chrysler's failure to request evidence of insurance will in no event relieve Seller of its obligation under this Clause 11. Seller will be financially responsible for any of Seller's premiums, deductibles, retentions, self-insurance, co-insurance, uninsured amounts, or any amounts in excess of policy limits. Seller may satisfy the insurance requirements under this Clause 11 through a combination of self-insurance and catastrophic excess insurance.

(YFAI's 56.1 ¶ 15; Pls.' Resp. to YFAI's 56.1 ¶ 15; FCA's Resp. to YFAI's 56.1 ¶ 15.)

The indemnification clause reads:

Seller will defend, indemnify, and hold Chrysler and its subsidiaries, including their respective employees, officers, directors, agents or representatives harmless against all claims, suits, actions or proceedings ("Claims") and pay (i) all liabilities, losses, damages (including without limitation judgments, amounts paid in settlement and other recoveries), (ii) fees and expenses (including without limitation fees of counsel and experts) and (iii) other costs (collectively, "Expenses") in connection with any breach or nonperformance by Seller of the Order, or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing the Order, either on Chrysler's property or in the course of their employment (including without limitation, Expenses arising out of, or in connection with, vehicle recall and customer satisfaction campaigns, provided however that if Chrysler and Seller agree upon an Authority Definition Plan ("ADP") for goods supplied under the Order setting forth at a minimum an allocation of responsibility for design-related defects in the goods, then Seller's indemnification obligation for campaign Expenses will be determined based on the ADP).

(YFAI's 56.1 ¶ 16 (emphasis omitted); Pls.' Resp. to YFAI's 56.1 ¶ 16 (emphasis omitted);

FCA's Resp. to YFAI's 56.1 ¶ 16 (emphasis omitted).)[8]

### b.  FCA Purchase Orders ("POs")

### i.  Purchase Order No. 10276401

"In or about October 2013, FCA published a request for proposal ('RFQ') to [Johnson

Controls] and JCIM as a potential supplier regarding Source Package 20978 for the design,

engineering and supply of the instrument panel ('IP') for new Chrysler Pacifica vehicles (called

the 'RU' vehicle)."  (FCA's 56.1 ¶ 32; AJJ's Resp. to FCA's 56.1 ¶ 32; YFAI's Resp. to FCA's

56.1 ¶ 32.)  The Parties dispute the scope of the RFQ, and particularly whether the RFQ included

any specifications regarding the MPR cover, including by reference to industry standards and/or

applicable regulatory requirements.  (*See* FCA's 56.1 ¶¶ 33–40; AJJ's Resp. to FCA's 56.1 ¶¶

33–40; YFAI's Resp. to FCA's 56.1 ¶¶ 33–40.)

Nevertheless, Johnson Controls submitted a bid to FCA in response to the RFQ.  (*See*

FCA's 56.1 ¶ 41; AJJ's Resp. to FCA's 56.1 ¶ 41; YFAI's Resp. to FCA's 56.1 ¶ 41.)  Again,

however, the Parties dispute whether the Johnson Controls' bid included the relevant

"engineering standards applicable to the RU IP components," including who bore the

responsibility for the designs.  (*See* FCA' 56.1 ¶¶ 41–44; AJJ's Resp. to FCA's 56.1 ¶¶ 41–44;

YFAI's Resp. to FCA's 56.1 ¶¶ 41–44.)

"FCA accepted [Johnson Controls'] bid for the RU IP work under Source Package 20978

and issued FCA PO 10276401 to JCI online."  (FCA's 56.1 ¶ 46; AJJ's Resp. to FCA's 56.1 ¶

46; YFAI's Resp. to FCA's 56.1 ¶ 46.)  "FCA PO 10276401 issued on March 18, 2014 was

---

[8] FCA disputes this clause only insofar as it is "misleading since highlighting is not in the
original contract."  (FCA's Resp. to YFAI's 56.1 ¶ 17.)  This dispute is immaterial and thus
disregarded by the Court.

subject to the FCA General T&Cs 09/2020 version then in effect." (FCA's 56.1 ¶ 49; YFAI's Resp. to FCA's 56.1 ¶ 49.)[9]

ii. Purchase Order No. 48200015

FCA issued Purchase Order No. "48200015 on July 9, 2014 for RU IP ED&D work in response to [Johnson Controls'] bid for Source Package 20978." (FCA's 56.1 ¶ 59; AJJ's Resp. to FCA's 56.1 ¶ 59; YFAI's Resp. to FCA's 56.1 ¶ 59.) The Parties dispute, however, to whom P.O. 48200015 was originally issued: YFAI or Johnson Controls. (See AJJ's Resp. to FCA's 56.1 ¶ 60; YFAI's Resp. to FCA's 56.1 ¶ 60.) And while AJJ concedes that Johnson Controls performed work on the RU IP, including "prepar[ing] 3-D [Computer-Aided Design ('CAD')] drawings, and perform[ing] testing on, the MPR cover and steering column cover," AJJ asserts that such work did *not* constitute acceptance of Purchase Order No. 48200015 in part because the testing and design responsibilities were performed under FCA's supervision and subject to FCA's approval. (See FCA's 56.1 ¶¶ 63–67; AJJ's Resp. to FCA's 56.1 ¶¶ 63–67.) This dispute carried over following the July 2, 2015 establishment of YFAI, as the Parties dispute the extent of responsibilities YFAI assumed from Johnson Controls. (See FCA's 56.1 ¶¶ 71, 73; YFAI's Resp. to FCA's 56.1 ¶¶ 71, 73.) Nonetheless, FCA updated PO 48200015 after YFAI's creation to reflect YFAI as the supplied in question. (See FCA's 56.1 ¶¶ 74–77; AJJ's Resp. to FCA's 56.1 ¶¶ 74–77; YFAI's Resp. to FCA's 56.1 ¶¶ 74–77.)

"[Johnson Controls] sent FCA invoice number 5404167115 for ED&D work under FCA PO 48200015 . . . on September 30, 2014." (FCA's 56.1 ¶ 83; AJJ's Resp. to FCA's 56.1 ¶ 83;

---

[9] AJJ formally disputes this clause, however the stated dispute seemingly does not relate to anything stated in ¶ 49. (See AJJ's Resp. to FCA's 56.1 ¶ 49.) Instead, AJJ reiterates an argument more appropriately lodged against ¶ 48 and several other clauses as discussed *infra*, disputing whether PO 10276401 as attached by FCA was ever issued to JCI. (See *id.* at ¶ 48.) Given that this dispute is irrelevant to the fact at issue, the Court deems this fact admitted.

12

YFAI's Resp. to FCA's 56.1 ¶ 83.)  "YFAI sent FCA invoice number 6720089816 on May 11,

2016 for ED&D work . . . under FCA PO 48200015."  (FCA's 56.1 ¶ 84; AJJ's Resp. to FCA's

56.1 ¶ 84; YFAI's Resp. to FCA's 56.1 ¶ 84.)  "YFAI sent FCA invoice number 6720135744 on

September 19, 2016 ED&D work . . . under FCA PO 48200015."  (FCA's 56.1 ¶ 85; AJJ's Resp.

to FCA's 56.1 ¶ 85; YFAI's Resp. to FCA's 56.1 ¶ 85.)  "FCA made payments for the work

under FCA PO 4800015 pursuant to the invoices it received."  (FCA's 56.1 ¶ 86; AJJ's Resp. to

FCA's 56.1 ¶ 86; YFAI's Resp. to FCA's 56.1 ¶ 86.)

### iii.  Purchase Order No. 10184678

Finally, "FCA issued a Request for Proposal for a Same Source Similar Part Package No.

26309 to [Johnson Controls] in order to add levels of complexity to the steering column for the

Pacifica's steering column cover encompassed within Source Package 20978."  (FCA's 56.1 ¶

53; AJJ's Resp. to FCA's 56.1 ¶ 53; YFAI's Resp. to FCA's 56.1 ¶ 53.)  Johnson Controls then

submitted a bid in response, which was subsequently accepted.  (*See* FCA's 56.1 ¶¶ 54–55; AJJ's

Resp. to FCA's 56.1 ¶¶ 54–55; YFAI's Resp. to FCA's 56.1 ¶¶ 54–55.)  The Purchase Order,

No. 10184678, dated May 11, 2015, is subject to General T&Cs dated September 2010.  (*See*

FCA's 56.1 ¶¶ 55, 58; AJJ's Resp. to FCA's 56.1 ¶¶ 55, 58; YFAI's Resp. to FCA's 56.1 ¶¶ 55,

58.)

### iv.  Purchase Order No. 10869201

"On April 2, 2016[,] FCA issued FCA PO No. 10869201[ ]to YFAI, dated April 2, 2016 .

. . for production level steering column covers with integrated MPR covers."  (FCA's 56.1 ¶ 107;

AJJ's Resp. to FCA's 56.1 ¶ 107; YFAI's Resp. to FCA's 56.1 ¶ 107.)  "YFAI manufactured and

supplied steering column covers with integrated MPR covers pursuant to FCA pursuant to PO

10869201."  (FCA's 56.1 ¶ 108; AJJ's Resp. to FCA's 56.1 ¶ 108; YFAI's Resp. to FCA's 56.1

13

¶ 108.)  "FCA PO 10869201 is subject to . . . General T&Cs[] dated September, 2010."  (FCA's 56.1 ¶ 111; AJJ's Resp. to FCA's 56.1 ¶ 111; YFAI's Resp. to FCA's 56.1 ¶ 111.)

### c.  Purported Safety Failures

The Parties dispute the extent to which FCA was involved in, oversaw, and was responsible for designing and testing the MPR Cover, including with respect to relevant regulatory requirements.  FCA asserts that it "provided [YFAI and Johnson Controls] with requirements and specifications including specific requirements for the MPR cover. Performance specification PF-11365 specifically referred the[m] . . . to FMVSS [('Federal Motor Vehicle Safety Standards')] 114 subsection 5.2.4 which specifically required that the MPR cover be opaque and removable only with a tool."  (FCA's 56.1 ¶ 87.)  By contrast, AJJ contends that the "DVP&R [('Design Verification Plan and Report')] confirms that the requirement was for the supplier to provide an MPR cover design that FCA would approve, and then FCA would test to confirm compliance with its specifications and FMVSS 114," and that "FCA ultimately confirmed that all requirements were met."  (AJJ's Resp. to FCA's 56.1 ¶ 87.)  So, too, does YFAI assert not only that FMVSS 114 is inapplicable as a "system level requirement," YFAI also states that FCA provided distinct "design specifications . . ., tested the component to obtain FCA's approval, and FCA retained FMVSS 114 compliance responsibility."  (YFAI's Resp. to FCA's 56.1 ¶ 87.)  Indeed, the Parties dispute the overall responsibility for compliance with FMVSS 114 and overall responsibilities through discussion of the design process, including but not limited to the degree of responsibility and involvement of certain individuals affiliated with the different parties as well as what information was provided to the Parties throughout the design process.  (*See* FCA's 56.1 ¶¶ 89–92, 95–101; AJJ's Resp. to FCA's 56.1 ¶¶ 89–92, 95–101; YFAI's Resp. to FCA's 56.1 ¶¶ 89–92, 95–101.)  To that end, there is also a dispute as to

whether YFAI and Johnson Controls "had the ability to test the MPR cover for retention forces in the steering column without the whole vehicle" and whether they in fact performed such tests. (FCA's 56.1 ¶¶ 102–105; AJJ's Resp. to FCA's 56.1 ¶¶ 102–105; YFAI's Resp. to FCA's 56.1 ¶¶ 102–105.)  Ultimately, however, "YFAI provided FCA with an RU IP with MPR cover and steering column cover upon which FCA did the FMVSS test in November 2015.  The MPR cover passed the test and could only be removed with a tool."  (FCA's 56.1 ¶ 106; AJJ's Resp. to FCA's 56.1 ¶ 106; YFAI's Resp. to FCA's 56.1 ¶ 106.)

The Parties don't dispute the existence of *some* prior knowledge of concerns regarding the MPR cap, but they do dispute what occurred regarding the nature of the MPR caps malfunctioning as well as what followed, including what gave rise to the malfunctioning, what actions were taken in response, by whom, and what resulted therefrom.  For example, the Parties also do not dispute that in 2017, "FCA received additional reports of the MPR door/plug coming loose," (Pls.' 56.1 ¶ 65; FCA's Resp. to Pls.' 56.1 ¶ 65; AJJ's Resp. to Pls.' 56.1 ¶ 65; YFAI's Resp. to Pls.' 56.1 ¶ 65.)[10]

However, Plaintiffs, AJJ, and YFAI assert that the issue stems from "the MPR cover coming loose and *falling out during the assembly process*."  (Pls.' 56.1 ¶ 60 (emphasis added); AJJ's Resp. to Pls.' 56.1 ¶ 60 (same); YFAI's Resp. to Pls.' 56.1 ¶ 60 (same).)  By contrast, FCA contends that the issue arises "when [the MPR covers] *were being hit from the 'B side' when the steering column covers were being lined up at the sequencer prior to assembly*."  (FCA's Resp.

---

[10] FCA's dispute does not substantively undermine the factual allegation, but instead only adds irrelevant facts concerning what FCA learned, namely "that a discrete set MPR covers were not seating properly in the steering column cover, which were segregated and replaced."  (FCA's Resp. to Pls.' 56.1 ¶ 65.)  Accordingly, the Court deems this fact admitted.  *See Arch Specialty*, 2021 WL 1225447, at *1 n.1.

to Pls.' 56.1 ¶ 60 (emphasis added).)[11]   The Parties also dispute what "action was taken at that

time to improve the fit or retention of the MPR door/plug" as well as whether any action was

taken "to investigate the consumer safety implications of the problem."  (Pls.' 56.1 ¶ 61; FCA's

Resp. to Pls.' 56.1 ¶ 61; AJJ's Resp. to Pls.' 56.1 ¶ 61; YFAI's Resp. to Pls.' 56.1 ¶ 61.)  The

Parties also dispute the breadth and severity of the issue—namely whether this was widespread

of solely infected a handful of MPR covers—as well as the testing done in response (including

newly-changed FCA internal requirements).  (*See* Pls.' 56.1 ¶¶ 62, 64, 66, 68–72; FCA's Resp.

to Pls.' 56.1 ¶¶ 62, 64, 66, 68–72; AJJ's Resp. to Pls.' 56.1 ¶¶ 62, 64, 66, 68–72; YFAI's Resp.

to Pls.' 56.1 ¶¶ 62, 64, 66, 68–72.)

### 4.  FCA's Investigation

In March 2018, "FCA opened a pre-Phase One Investigation into the 2017 and 2018 RU

(Pacifica)," wherein Joseph Mihm ("Mihm") "was assigned to investigate the MPR issue."  (Pls.'

56.1 ¶ 101; FCA's Resp. to Pls.' 56.1 ¶ 101; AJJ's Resp. to Pls.' 56.1 ¶ 101; YFAI's Resp. to

Pls.' 56.1 ¶ 101.)  In his investigation notes, on March 2, 2018, Mihm documented the following

issue: "Apparently Interior did not know you had to have a tool to remove the 'door' (the

---

[11] FCA also includes numerous irrelevant facts and legal conclusions in its rebuttal, (*see* FCA's Resp. to Pls.' 56.1 ¶ 60), which it then needlessly repeats nearly 50 times.  (*See id.* ¶¶ 69–88, 90–127.)   Indeed, this lengthy portion of the response is "rife with legal argument improper in a Rule 56.1 Statement," *Cunningham*, 2019 WL 4735876, at *1 n.3,ranging from discussions of products liability law to the rules of evidence (e.g., relevance, prejudice, hearsay, and admissibility).

It is black-letter law in the Second Circuit that such submissions "*are not argument*. They should contain factual assertions with citation to the record.  They should not contain conclusions."  *U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers Loc. Union No. 3*, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006) (emphasis in original) (internal quotation marks omitted) (quoting *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999), *aff'd*, 56 F. App'x 27 (2d Cir. 2003)).  The Court simply will not countenance, let alone consider, such pronouncements, and disregards them each time throughout FCA's reply.

regulation) because the tether-ratchet-cable mechanism belongs to Chassis.  Once they knew, they increased the amount of force required to remove the door so you had to have a tool."  (Pls.' 56.1 ¶ 104; FCA's Resp. to Pls.' 56.1 ¶ 104; AJJ's Resp. to Pls.' 56.1 ¶ 104; YFAI's Resp. to Pls.' 56.1 ¶ 104.)  Five days later, Mihm memorialized in his investigative journal: "We have a compliance issue with FMVSS 114, S 5.2.4 (c)" that was "undetectable to [the] driver," a consequence of which Mihm noted could be "'inadvertent vehicle movement'" that "'may result in injury to bystanders, and case [sic] cause vehicle crash without prior warning.'"  (Pls.' 56.1 ¶¶ 102, 109, 108; FCA's Resp. to Pls.' 56.1 ¶¶ 102–103, 108–109; AJJ's Resp. to Pls.' 56.1 ¶¶ 102–103, 108–109; YFAI's Resp. to Pls.' 56.1 ¶¶ 102–103, 108–109.)  The Parties dispute, however, whether the "root cause" listed in Mihm's investigative notes read: "Chrysler Design" or "supplier design."  (Pls.' 56.1 ¶ 107; FCA's Resp. to Pls.' 56.1 ¶ 107; YFAI's Resp. to Pls.' 56.1 ¶ 107.)  "Mihm testified that all saleable vehicles manufactured from the start of production until April 6, 2018, which would include [Plaintiffs'] vehicle, were affected by the defect."  (Pls.' 56.1 ¶ 113; FCA's Resp. to Pls.' 56.1 ¶ 113; AJJ's Resp. to Pls.' 56.1 ¶ 113; YFAI's Resp. to Pls.' 56.1 ¶ 113.)[12]

### 5.  Pacifica Recall[13]

On June 7, 2018, the Vehicle Safety and Regulatory Compliance committee ("VSRC") "initiate[d] a recall for 2017 and 2018 Pacifica vehicles . . . to install new MPR plugs that had a

---

[12] FCA's dispute arises from a semantic and legal argument—i.e. a "defect" as understood in New York law—and thus is disregarded.  *See Arch Specialty*, 2021 WL 1225447, at *1 n.1 (disregarding semantic disputes).

[13] FCA improperly—and, once again, *repeatedly*—injects argument in its 56.1 Reply, arguing that "[its] voluntary recall is a subsequent remedial measure, and therefore should not be considered by the Court on summary judgment."  (FCA's Resp. to Pls.' 56.1 ¶¶ 115, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127.)  Notwithstanding its incorrect placement, FCA is

more secure fit and could not be opened with a finger."  (Pls.' 56.1 ¶¶ 117; FCA's Resp. to Pls.'

56.1 ¶¶ 117; AJJ's Resp. to Pls.' 56.1 ¶¶ 117; YFAI's Resp. to Pls.' 56.1 ¶¶ 117.)  The company

notified the National Highway Traffic Safety Administration ("NHTSA") of the recall on June

---

right insofar as "Federal Rule of Evidence 407 excludes from evidence remedial measures taken
after an accident if used to demonstrate negligence, culpable conduct, a defect in a product or its
design, or need for a warning, but permits the use of such evidence to demonstrate ownership,
control, or the feasibility of precautionary measures." *Sadio v. MacLaren USA, Inc.*, No. 10-CV-
8381, 2014 WL 6487776, at *1 (S.D.N.Y. Nov. 13, 2014).  Moreover, the Second Circuit has
specifically extended Rule 407 to "appl[y] to strict products liability actions." *Cann v. Ford
Motor Co.*, 658 F.2d 54, 60 (2d Cir. 1981) ("Since the policy underlying Rule 407 not to
discourage persons from taking remedial measures is relevant to defendants sued under either
theory, we do not see the significance of the distinction.  A potential defendant must be equally
concerned regardless [of whether they are sued under a negligence or strict liability theory] . . . .
In sum, we hold that Rule 407 applies to strict products liability actions.").

     "By its terms, however, Rule 407 bars evidence of remedial measures taken *after* an
injury or harm. Rule 407 'does not apply to *pre* accident conduct.'" *Figueroa v. Bos. Sci. Corp.*,
No. 00-CV-7922, 2003 WL 21488012, at *5 (S.D.N.Y. June 27, 2003) (emphases in original)
(quoting *Ake v. Gen. Motors Corp.*, 942 F. Supp. 869, 879 (W.D.N.Y. 1996)); *see also id.*
(collecting cases from the First, Fourth, and Sixth Circuits upholding this interpretation of Rule
407).  Indeed, "in *Figueroa* . . ., a recall on a vaginal mesh device occurred four months before
the discovery and diagnosis of the plaintiff's vaginal erosion and five months before the device
was removed," but because evidence of the harm occurred after the recall, it was admissible. *In
re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prod. Liab. Litig.*, No. 17-
CV-2775, 2021 WL 2407566, at *3 (D. Md. June 11, 2021) (citing *Figueroa*, 2003 WL
21488012, at *5).

     Notably, FCA relies on, inter alia, *Chase v. General Motors Corp.*, 856 F.2d 17 (4th Cir.
1988).  However, in *Chase*, the Fourth circuit *specifically* held that events or actions taken before
the "event" at issue in Rule 407 (since revised by Congress as the "harm") are admissible, stating
that the plaintiffs "are perfectly free" to explore the actions taken prior to the harm visited upon
them, including "the reasons for" the change. *Id.* at 22.  Otherwise, FCA cites *Rutledge v.
Harley-Davidson Motor Co.*, 364 F. App'x 103, 105 (5th Cir. 2010), and *Cann*, 658 F.2d at 60.
(*See, e.g.*, FCA's Resp. to Pls.' 56.1 ¶ 121.)  However, in each of those cases, the recall occurred
*after* the accident occurred, thereby falling within the purview of Rule 407. *See Rutledge*, 364 F.
App'x at 106 ("The recall notices were issued in January and March 2007, after Rutledge's
accident in December 2006. . . . Therefore, the district court correctly identified the recall notices
as subsequent remedial measures under Rule 407."); *Cann*, 658 F.2d at 60 ("Rule 407 speaks
even more directly to the admissibility of evidence of post-accident design changes.")

     In this Action, the recall was initiated on June 7, 2018, and the NTSHA was informed of
the recall *before* Plaintiff's harms.  Because the evidence regarding the recall is properly
classified as "pre-accident," it "is not precluded." *Sadio*, 2014 WL 6487776, at *1.

20, 2018.  (Pls.' 56.1 ¶ 119; AJJ's Resp. to Pls.' 56.1 ¶ 119; YFAI's Resp. to Pls.' 56.1 ¶ 119.)[14]

"FCA's recall notification to the NHTSA [] states: 'If the MPR is engaged unintentionally, the

vehicle could roll away striking and injuring a bystander or cause a crash.'"  (Pls.' 56.1 ¶ 121;

FCA's Resp. to Pls.' 56.1 ¶ 121; AJJ's Resp. to Pls.' 56.1 ¶ 121; YFAI's Resp. to Pls.' 56.1 ¶

121.)  Moreover, the Recall Report states:

> Some 2017-2018 MY Chrysler Pacifica ("RU") vehicles may have a Manual Park
> Release ("MPR") that can be accessed by the removal of a shifter over ride plug
> ("Plug") without the use of a screwdriver or other tool. The suspect period was
> established as 2017-2018 RU vehicles built at Windsor Assembly Plant ("WAP")
> between the Start of Production ("SOP") of the 2017 MY, June 15, 2016, to April
> 6, 2018, when FCA US LLC ("FCA US") began using redesigned Plugs with a
> higher pullout force, and requiring the use of a screwdriver or other tool. Similar
> vehicles not included within the recall were built after April 6, 2018, and were built
> with redesigned Plugs with a higher pull-out force, and requiring the use of a
> screwdriver or other tool.

(Pls.' 56.1 ¶ 122; FCA's Resp. to Pls.' 56.1 ¶ 122; AJJ's Resp. to Pls.' 56.1 ¶ 122; YFAI's Resp.

to Pls.' 56.1 ¶ 122.)

The description of the noncompliance reads:

> [FMVSS 571.114 requires that if a gear selection control override option (MPR)
> is present, the device can only be removed (accessed) by using a screwdriver or
> other tool.  For vehicles in the recall population, access to the MPR may be possible
> without the use of a screwdriver or other tool.

(Pls.' 56.1 ¶ 123; FCA's Resp. to Pls.' 56.1 ¶ 123; AJJ's Resp. to Pls.' 56.1 ¶ 123; YFAI's Resp.

to Pls.' 56.1 ¶ 123.)

The Description of the Safety Risk reads:

---

[14] In FCA's response to Plaintiffs' 56.1, FCA appears to omit Plaintiffs' factual allegation
¶ 119.  (*Compare* Pls.' 56.1 ¶ 119 *with* FCA's Resp. to Pls.' 56.1 ¶ 119.)  The Court deems this
an inadvertent error, as FCA continues to respond to the rest of Plaintiffs' allegations, in the
same order as presented by Plaintiffs for the rest of the filing.  (*See, e.g.*, Pls.' 56.1 ¶ 120; FCA's
Resp. to Pls.' 56.1 ¶ 119.)  As such, the Court will refer to the Plaintiffs' numbering of the
factual allegations in relation to FCA's response, even though FCA's actual numbering will be
off by a single number.

> If the MPR is unintentionally actuated, it could result in inadvertent vehicle movement. Inadvertent vehicle movement may result in injury to bystanders, and can cause vehicle crash without prior warning.

(Pls.' 56.1 ¶ 124; FCA's Resp. to Pls.' 56.1 ¶ 124; AJJ's Resp. to Pls.' 56.1 ¶ 124; YFAI's Resp. to Pls.' 56.1 ¶ 124.)

Pursuant to the recall, "FCA's remedy was that it would 'conduct a Voluntary Safety Recall to replace MPR Plugs with revised Plugs that require a screwdriver or other tool to remove.'"  (Pls.' 56.1 ¶ 126; FCA's Resp. to Pls.' 56.1 ¶ 126; AJJ's Resp. to Pls.' 56.1 ¶ 126; YFAI's Resp. to Pls.' 56.1 ¶ 126.)  As well, FCA's "dealer service instructions for the recall" were as follows:

> The Manual Park Release (MPR) on about 240,000 of the above vehicles may be accessed by removal of a shifter over ride plug (Plug) without the use of a screwdriver or other tool. If the MPR is unintentionally actuated, it could result in inadvertent vehicle movement. Inadvertent vehicle movement may result in injury to bystanders, and can cause a vehicle crash without prior warning. The condition described above does not comply with Federal Motor Vehicle Safety Standard (FMVSS) No. 114 Theft Protection and Rollaway Prevention which requires that if a gear selection control override option (MPR) is present, the device can only be removed (accessed) by using a screwdriver or other tool.

(Pls.' 56.1 ¶ 127; FCA's Resp. to Pls.' 56.1 ¶ 127; AJJ's Resp. to Pls.' 56.1 ¶ 127; YFAI's Resp. to Pls.' 56.1 ¶ 127.)

Plaintiffs' car was subject to the recall.  (Pls.' 56.1 ¶ 128; FCA's Resp. to Pls.' 56.1 ¶ 128; AJJ's Resp. to Pls.' 56.1 ¶ 128; YFAI's Resp. to Pls.' 56.1 ¶ 128.)

B.  Procedural History[15]

1.  Initial Filings

Plaintiffs filed their initial Complaint against FCA on August 2, 2018.  (*See* Compl. (Dkt. No. 1).)  On June 12, 2019, Plaintiffs filed a First Amended Complaint against FCA and YFAI.  (*See* First Am. Compl. (Dkt. No. 29).)  On October 18, 2019, Plaintiffs filed a Second Amended Complaint, this time against FCA, YFAI, Adient, and Johnson Controls.  (*See* Second Am. Compl. (Dkt. No. 69).)  Finally, on September 11, 2020, Plaintiffs filed a Third Amended Complaint against all Defendants.  (*See* TAC.)  In response to Plaintiffs' Third Amended Complaint, Defendants each filed Answers to the Amended Complaint which featured a number of additional crossclaims.  (*See* Dkt. Nos. 172, 174, 176.)  The Court recounts each Answer in turn.

On September 25, 2020, AJJ filed an Answer to the Third Amended Complaint.  (*See* Defs.' Answer and Affirmative Defenses to Pls.' Third Am. Compl. ("AJJ Answer to TAC") (Dkt. No. 172).)  In the Answer, AJJ filed two crossclaims against FCA, asserting that FCA is liable for (1) indemnification and (2) contribution.  (*See id*. at 41–42.)  In addition, AJJ filed three crossclaims against YFAI, asserting that YFAI is liable for (1) common law indemnification, (2) contribution, and (3) contractual indemnification.  (*See id*. at 42–43.)  On October 16, 2020, YFAI filed an Answer to the applicable crossclaims.  (*See* YFAI Answer to AJJ's Crossclaims (Dkt. No. 177).)  On October 27, 2020, FCA filed an Answer to the applicable crossclaims.  (*See* FCA's Answer to AJJ's Crossclaims (Dkt. No. 182).)

---

[15] The procedural history of this case is—charitably speaking—complicated, given the numerous Parties and crossclaims.  (*See generally* Dkt.)  Accordingly, the Court recites this procedural history only as relevant to the instant Motions.

Meanwhile, on October 2, 2020, FCA filed an Answer to the Third Amended Complaint. (*See* FCA's Answer to Pls.' Third Am. Compl. ("FCA Answer to TAC") (Dkt. No. 174).)  In the answer, FCA filed eight crossclaims against AJJ and YFAI for: (1) contractual indemnity and defense; (2) contractual liability under "Authority Definition Plans" included in bids for work on the RU Program; (3) breach of warranty; (4) common law indemnity; (5) contribution; (6) breach of contract for failure to procure insurance for FCA; (7) contractual liability and indemnity under "FCA US Process Standard PS-7000"; and (8) contractual indemnity and defense under a "Letter of Intent" between FCA and JCI.  (*See id*. at 26–43.)[16]  On October 22, 2020, YFAI filed an Answer to the crossclaims.  (*See* YFAI Answer to FCA's Crossclaims (Dkt. No. 178).)  On October 26, 2020, AJJ filed an Answer to the FCA crossclaims.  (AJJ's Answer to FCA's Crossclaims (Dkt. No. 179).)[17]

On October 5, 2020, YFAI filed an Answer to the Third Amended Complaint.  (*See* YFAI's Answer to Pls.' Third Am. Compl. ("YFAI Answer to TAC") (Dkt. No. 176).)  In the Answer, YFAI filed two crossclaims against FCA, asserting that FCA is liable for (1) indemnification and (2) contribution.  (*See id*. at 15–16.)  In addition, YFAI filed three crossclaims against AJJ, asserting that AJJ is liable for (1) common law indemnification, (2) contribution, and (3) contractual indemnification.  (*See id*. at 17–18.)  On October 26, 2020, AJJ filed an Answer to the crossclaims.  (*See* AJJ's Answer to YFAI Crossclaims (Dkt. No. 180).)

---

[16] In the Answer, FCA refers to nine crossclaims, however the Answer includes eight. This appears to be a nonmaterial error.

[17] In this Answer, AJJ also reasserted the crossclaims against YFAI.  On November 16, 2020, YFAI filed another Answer to the crossclaims, largely mirroring the first Answer filed on October 16, 2020.  (*Compare* Dkt. No. 177, *with* Dkt. No. 186.)

On October 27, 2020, FCA filed an Answer to the crossclaims.  (*See* FCA's Answer to YFAI Crossclaims (Dkt. No. 181).)

2.  <u>Summary Judgment Motions</u>

On September 30, 2021, Plaintiffs filed their Motion for Summary Judgment and ancillary papers. (*See* Pls.' Not. of Mot.; Mem. Of Law in Supp. of Mot. ("Pls.' Mem") (Dkt. No. 229); Decl. of Yitzchak M. Fogel in Supp. of Pls.' Mot. ("Fogel Decl. in Supp. of Pls.' Mot. I") (Dkt. No. 231); Pls.' 56.1; Decl. of Yitzchak M. Fogel in Supp. of Pls.' Mot. (Dkt. No. 249).) FCA filed their Opposition on December 22, 2021.  (*See* FCA's Mem. of Law in Opp. To Mot. ("FCA's Pls. Opp.") (Dkt. No. 265); FCA's Resp. to Pls.' 56.1; Decl. of Maureen Fogel in Opp. to Pls.' Mot. ("Fogel Decl. in Opp. to Pls.' Mot.") (Dkt. No. 267); Decl. of David R. Bernier in Opp. to Pls.' Mot. (Dkt. No. 268); Decl. of Charles Brady in Opp. to Pls.' Mot. (Dkt. No. 269); Decl. of Joseph Tereau in Opp. to Pls.' Mot. (Dkt. No. 270); Supp. Decl. of Joseph Tereau in Opp. to Pls.' Mot. (Dkt. No. 271).)  AJJ filed their Opposition on January 14, 2022.  (*See* AJJ's Mem. of Law in Opp. to Pls.' Mot. ("AJJ's Pls.' Opp.") (Dkt. No. 311); AJJ's Resp. to Pls.' 56.1.)  YFAI filed its Opposition on the same day.  (*See* YFAI's Resp. to Pls.' 56.1; YFAI's Mem. of Law in Opp. of Pls.' Mot. ("YFAI's Pls. Opp.") (Dkt. No. 317); Decl. of Cathleen A. Giannetta (Dkt. No. 318).)  Plaintiffs filed their Reply on February 28, 2022.  (*See* Reply Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Reply Mem.") (Dkt. No. 338); Decl. of Yitzchak M. Fogel (Dkt. No. 341).)

On September 30, 2021, FCA filed its Motion for Summary Judgment against YFAI and AJJ.  (*See* FCA's Not. of Mot.; Mem. of Law in Supp. of Mot. ("FCA's Mem.") (Dkt. No. 240); FCA's 56.1; Fogel Decl. ("Fogel Decl. in Supp. of FCA's Mot.") (Dkt. No. 243); Michele Graber Decl. ("Graber Decl.") (Dkt. No. 244); Guido Aff. (Dkt. No. 245); Kastamo Aff. (Dkt.

23

No. 246); Decl. of Joseph Tereau (Dkt. No. 247); Michele Graber Decl. (Dkt. No. 256); Am.

Fogel Decl. (Dkt. No. 257).)  AJJ filed their Opposition on January 14, 2022.  (*See* AJJ's Mem.

of Law in Opp. to FCA's Mot. ("AJJ's FCA Opp.") (Dkt. No. 313); AJJ's Resp. to FCA's 56.1.)

YFAI filed its Opposition on the same day.  (*See* YFAI's Mem. of Law in Opp. of FCA's Mot.

("YFAI's FCA Opp.") (Dkt. No. 323); YFAI's Resp. to FCA's 56.1; Decl. of Cathleen A.

Giannetta (Dkt. No. 324).)  FCA filed its Reply on February 28, 2022.  (*See* Reply Mem. of Law

in Supp. of FCA's Mot. ("FCA's Reply Mem.") (Dkt. No. 339); Fogel Suppl. Decl. in Reply to

Mot. (Dkt. No. 342).)

On September 30, 2021, YFAI filed its Motion for Summary Judgment against Plaintiffs

and FCA.  (*See* YFAI's Not. of Mot.; YFAI's 56.1; Decl. of Cathleen A. Giannetta ("Giannetta

Decl.") (Dkt. No. 250-2); Mem. of Law in Supp. of YFAI's Mot. for Summ. J. ("YFAI's Mem.")

(Dkt. No. 250-3).)[18]  FCA filed its Opposition on December 22, 2021.  (*See* FCA's Mem. of Law

in Opp. to YFAI's Mot. To Dismiss Crossclaims ("FCA's YFAI Opp.") (Dkt. No. 275); FCA's

Resp. to YFAI's 56.1; Fogel Decl. in Opp. to YFAI Mot. (Dkt. No. 277); Decl. of Joseph Tereau

(Dkt. No. 278); Michele Graber Decl. (Dkt. No. 279); Guido Aff. (Dkt. No. 280); Kastamo Aff.

(Dkt. No. 281); Decl. of David R. Bernier (Dkt. No. 282).)  Plaintiffs filed their Opposition on

January 14, 2022.  (*See* Pls.' Mem. of Law in Opp. to YFAI's Mot. ("Pls.' YFAI Opp.") (Dkt.

---

[18] It appears that on September 30, 2021 and October 1, 2021, YFAI filed two almost
identical motions for summary judgment.  (*Compare* Dkt. No. 237 *with* Dkt. No. 250.)  Upon
inspection, Dkt. No. 237 and Dkt. No. 250 contain the exact same Notices of Motion, Rule 56.1
Statements, a Declaration in Support of the Motion, and the Memorandum of Law.  However,
Dkt. No. 250 contains far more exhibits in support of the Motion, including
numerous substantive exhibits likely produced in discovery.  (*See* Dkt. No. 250).  As such, the Court
determines that this was likely a filing error and views these two motions as identical, accepting
the exhibits brought forth in Dkt. No. 250.

No. 303); Pls.' Resp. to YFAI's 56.1.)  YFAI filed its Reply on February 28, 2022.  (*See* Reply to Pls.' and FCA's Opp. to YFAI's Mot. for Summ. J. ("YFAI's Reply Mem.") (Dkt. No. 334).)

On September 30, 2021, AJJ filed its Motion for Summary Judgment against Plaintiffs. (*See* AJJ's Pls. Not. of Mot.; AJJ's Pls. 56.1; Mem. of Law in Supp. of AJJ's Mot. for Summ. J. ("AJJ Mem.") (Dkt. No. 227-3); Decl. of John P. Mitchell in Supp. of Mot. for Summ. J. ("Mitchell Pls. Decl.") (Dkt. No. 230).)  Plaintiffs filed their Opposition on January 14, 2022. (*See* Pls.' Mem. of Law in Opp. to AJJ's Mot. for Summ. J. ("Pls.' AJJ Opp.") (Dkt. No. 305); Pls.' Resp. to AJJ's 56.1.)  AJJ filed its Reply on February 28, 2022.  (*See* Reply Mem. of Law in Supp. of AJJ's Mot. for Summ. J. ("AJJ Reply Mem.") (Dkt. No. 336); AJJ's Reply in Supp. of Rule 56.1 Statement (Dkt. No. 336-1).)

On September 30, 2021, AJJ also filed its Motion for Summary Judgment against YFAI. (*See* AJJ's YFAI Not. of Mot.; Mem. of Law in Supp. of AJJ's Mot. for Summ. J. (Dkt. No. 233-1); AJJ's YFAI 56.1; Decl. of John P. Mitchell in Supp. of Mot. for Summ. J. ("Mitchell YFAI Decl.") (Dkt. No. 235).)  YFAI filed its Opposition on January 14, 2022.  (*See* Mem. of Law in Opp. of AJJ's Mot. for Summ. J. (Dkt. No. 320); Decl. of Cathleen A. Giannetta (Dkt. No. 321); YFAI's Resp. to FCA's 56.1.)  AJJ filed its Reply on February 28, 2022.  (*See* Reply Mem. of Law in Supp. of AJJ's Mot. for Summ. J. (Dkt. No. 344); AJJ's Reply in Supp. of Rule 56.1 Statement (Dkt. No. 344-1).)

Finally, AJJ filed its Motion for Summary Judgment against FCA on September 30, 2021.  (*See* AJJ's FCA Not. of Mot.; AJJ's FCA's 56.1; Mem. of Law in Supp. of AJJ's Mot. for Summ. J. (Dkt. No. 236-3); Decl. of John P. Mitchell in Supp. of Mot. for Summ. J. ("Mitchell FCA Decl.") (Dkt. No. 241).)  FCA filed its Opposition on January 13, 2022.  (*See* FCA's Mem. of Law in Opp. to AJJ's Mot. for Summ. J. (Dkt. No. 291); FCA's Resp. to AJJ's 56.1; Fogel

Decl. (Dkt. No. 293); Guido Aff. (Dkt. No. 295); Kastamo Aff. (Dkt. No. 296); Decl. of Joseph

Tereau (Dkt. No. 297); Michele Graber Decl. (Dkt. No. 310).)  AJJ filed its Reply on February

28, 2022.  (*See* Reply Mem. of Law in Supp. of AJJ's Mot. for Summ. J. (Dkt. No. 340); AJJ's

Reply in Supp. of Rule 56.1 Statement (Dkt. No. 340-1).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v.

John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to

award summary judgment, the court must construe the record evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v.

Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232,

240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute

exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also

Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4

(S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order

to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d

114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted).  Further, "[t]o survive

a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the

27

matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

"Where, as here, cross motions for summary judgment are filed, [courts] 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quoting *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002)); *see also Dish Network Corp. v. Ace Am. Ins. Co.*, No. 20-268, 2021 WL 6058146, at *3 (2d Cir. Dec. 22, 2021) ("When both parties have moved for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017))); *Est. of Smith v. Cash Money Recs., Inc.*, No. 14-CV-2703, 2018 WL 2224993, at *3 (S.D.N.Y. May 15, 2018) ("On dueling motions for summary judgment, the court must evaluate each party's motion on its merits and determine whether either is entitled to judgment as a matter of law" (citing *Coutard*, 848 F.3d at 114)).

B.  Analysis

Both Plaintiffs and all Defendants separately move for summary judgment against several

Parties for differing claims.  The Court addresses the following motions in the order listed below:

- AJJ's Motion for Summary Judgment against Plaintiffs: AJJ moves for summary judgment against Plaintiffs, arguing that AJJ has been "improperly pursued" in the present litigation.  (*See generally* AJJ Mem.; Pls.' AJJ Opp.)

- Plaintiffs' Motion for Summary Judgment: Plaintiffs move for summary judgment against FCA on their strict products liability claim, arguing that 1) the MPR cover had a design defect, 2) the MPR cover had a manufacturing defect, and 3) that FCA failed to warn consumers.  Plaintiffs also move for summary judgment against all Defendants' comparative negligence and assumption of risk defenses.  (*See generally* Pls.' Mem.; FCA's Pls. Opp.; YFAI Pls. Opp.)

- FCA's Motion for Summary Judgment: FCA moves for summary judgment on its Motion for "contractual defense and indemnity" against YFAI.  (*See generally* FCA's Mem.; YFAI's FCA Opp.)

- YFAI's Motion for Summary Judgment: YFAI moves for summary judgment against FCA's third party claim and crossclaim for contribution, FCA's common law indemnification claim, FCA's breach of contract for failure to procure insurance claim, Plaintiffs' negligence cause of action, and Plaintiffs' strict liability cause of action.  (*See generally* YFAI's Mem.; FCA's YFAI Opp.; Pls.' YFAI Opp.)

1.  AJJ's Motion for Summary Judgment Against Plaintiffs

In its motion for summary judgment against Plaintiffs, AJJ argues that it was not

involved in the MPR cover design that eventually was installed in Plaintiffs' car.  (*See* AJJ Mem.

6).  AJJ argues that, since the companies were not in the chain of sale between FCA and

Plaintiffs, AJJ is entitled to summary judgment on all of Plaintiffs' claims.  (*Id.*).

Under New York law, "[l]iability cannot be imposed on a party that was outside the chain

of manufacturing, selling, or distributing a product."  *Dzhunaydov v. Emerson Electric Co.*, No.

12-CV-2188, 2016 WL 1069067, at *1 (E.D.N.Y. Mar. 17, 2016) (quoting *Bova v. Caterpillar,*

*Inc.*, 761 N.Y.S.2d 85, 87 (App. Div. 2003)); *see also Passaretti v. Aurora Pump Co.*, 607 N.Y.S.2d 688, 689 (App. Div. 1994) ("Liability may not be imposed for breach of warranty or strict products liability upon a party that is outside the manufacturing, selling, or distributive chain." (citations omitted)).  This is the same for design defects; defendants cannot be held strictly liable for a design defect if they had a limited role in its creation.  *See Finerty v. Abex Corp.*, 51 N.E.3d 555, 559 (N.Y. 2016) (holding that while a subsidiary of a company may have "provided guidance" in the design of tractor parts, it was "not a party within the distribution chain" and did not "place[] parts into the stream of commerce").

Here, AJJ's liability boils down to a simple question of contract law.  Both AJJ and YFAI agree that on July 2, 2015, Johnson Controls entered into a joint venture with Yanfeng Automotive Trim Systems Co., Ltd., to form YFAI.  (*See* FCA's 56.1 ¶ 9; YFAI's Resp. to FCA's 56.1 ¶ 9; AJJ's Pls. 56.1 ¶ 18.)[19]  Pursuant to the MA governing the deal, Johnson Controls "gave YFAI all its open contracts with FCA including working on the [2017 Chrysler Pacifica instrument panel], including [Purchase Order] 4820005."  (FCA's 56.1 ¶ 10; YFAI's Resp. to FCA's 56.1 ¶ 10.)  YFAI also "agreed to indemnify and hold harmless [Johnson Controls] for 'any and all [c]osts incurred by [Johnson Controls] arising out of, relating to or resulting from [YFAI's] [a]ssumed [l]iabilities,' including third party claims."  (AJJ'S YFAI 56.1 ¶ 10; YFAI's Resp. to AJJ's 56.1 ¶ 10.)  From this point in time, Johnson Controls' involvement in the production of the MPR plugs at issue ceased, transferring any liability AJJ

---

[19] As a technical matter, Plaintiffs disputed the portion of AJJ's 56.1 that speaks to this contract.  (*See* Pls.' Resp. to AJJ's 56.1 ¶ 18.)  However, Plaintiffs' dispute relies on facts that are not germane to the question as to whether this agreement was closed by July 2, 2015.  Moreover, Plaintiffs are arguing about the contract between AJJ and YFAI, a contract they are not—and have never been—a party to.  Therefore, while Plaintiff's dispute is noted, this does not change the opinion of the Court.

may have maintained to YFAI.  (*See* Mitchell Pls. Decl. Ex. D 162:7-163:14 (Dkt. No. 230-2.)

Indeed, FCA as the manufacturer of the car at issue appears to agree: after the joint venture,

YFAI began sending invoices to FCA under Purchase Order No. 48200015 which were paid by

FCA.  (*See* FCA's 56.1 ¶ 84–86; AJJ's Resp. to FCA's 56.1 ¶ 84–86; YFAI's Resp. to FCA's

56.1 ¶ 84–86; AJJ's Pls. 56.1 ¶ 18.)

     Importantly, YFAI and FCA continued to adjust the design of the MPR covers.  In at

least two depositions, executives reaffirmed that YFAI worked on the MPR design until at least

December 2015, at which time FCA finally approved the plug design for production.  (*See*

Mitchell Pls. Decl. Ex. D 165:11-22; Mitchell Pls. Decl. Ex. E 342:9–23 (Dkt. No. 230-3);

Mitchell YFAI Decl. Ex. T (Dkt. No. 235-16) (depicting MPR cover plans last revised on

October 27, 2015 and stamped by an "approver" on February 3, 2016).).  Moreover, the

production of the MPR cover did not begin until February 2016, after FCA approved the design.

(*See* Mitchell YFAI Decl. Ex. Q (Dkt. No. 235-13), at 265:4–9 (agreeing that Yanfeng and YFAI

"started to manufacture production MPR plugs in 2016).).

     Plaintiffs (and seemingly YFAI in other filings before this Court) argue there is a factual

dispute regarding who *actually* manufactured and distributed the MPR cover, based solely on a

stamp of an MPR cover with a manufacturing date of June 2015.  (*See* Pls.' AJJ Opp. 2–4;

Giannetta Decl. Ex. QQ (Dkt. No. 250-75).)  Plaintiffs allege both AJJ and YFAI could plausibly

be the manufacturers and distributors, because Johnson Controls worked on the MPR covers

until at least July 2, 2015, one month past the stamp on the MPR cover.  (*See* Pls.' AJJ Opp. 2–

4.)  The Court disagrees.

     As discussed above, the MPR cover used in Plaintiffs' car was not finalized until the end

of 2015.  (*See* Mitchell YFAI Decl. Ex. T.)  As such, a stamped and fully manufactured MPR

cover dated June 2015 is plainly a mistake.  An engineer at YFAI stated as much in an email asking for a status update from colleagues because there were "still a number of tools with 2015 date inserts in them" and YFAI had "been tracking this as an open issue for quite a while now." (Mitchell YFAI Decl. Ex. X, at 4 (Dkt. No. 235-20).)  Even if the Court were persuaded that Johnson Controls *could* be a manufacturer, Plaintiffs fail to address the joint venture between Johnson Controls and what later became YFAI.  (*See generally* Pls.' AJJ Opp.)  The MPR cover stamped as June 2015 does not vitiate the agreement between the two parties: after July 2, 2015, YFAI assumed all contracts from AJJ, and AJJ's liability ceased.  In addition, Plaintiff proffered no evidence post-dating the agreement that shows Johnson Control's involvement in manufacturing the MPR cover, and numerous pieces of evidence prove otherwise.  "Absent any evidence that [AJJ] was in fact a manufacturer or seller of [the MPR cover], [AJJ] may not be held liable under a strict products liability theory."  *Finerty*, 51 N.E.3d at 242.[20]

In their Opposition, Plaintiffs argue in the alternative that AJJ may still be liable for negligence and "failure to comply with FCA's contractual agreements and directives."  (Pls. AJJ. Opp. 4.)  This too fails for the reasons stated above.  *See, e.g.*, *Yargeau v. Laserton*, 7 N.Y.S.3d

---

[20] Separately, Plaintiffs argue that AJJ is liable for the "defective design" of the MPR cover.  (*See* Pls.' AJJ Opp. at 5–7.)  However, New York law is clear that "[i]t is the manufacturer, and the manufacturer alone, who can fairly be said to know and to understand when an article is suitably designed and safely made for its intended purpose and who has the practical opportunity, as well as a considerable incentive, to turn out . . . safe products."  *Finerty*, 27 N.Y.3d at 241 (citations and quotation marks omitted).  A defendant who designs a product is not, on its own, a manufacturer because the defendant is "not a party within the distribution chain" or "actually plac[ing] . . . parts into the stream of commerce."  *Id*. at 241–42 (noting that while the plaintiff "submitted evidence tending to show that [the defendant] provided guidance to [another defendant] in the design of certain tractor components," this was not sufficient to hold defendant liable under a strict product liability theory).  As such, and contrary to Plaintiffs' claims, AJJ was not "in a position to eliminate the danger of this defective product" because AJJ was not a manufacturer.  (*See* Pls.' AJJ Opp. at 7.)

780, 782 (App. Div. 2015) (finding that the court "properly dismissed the negligence and strict products liability claims based on design defect . . .because [the defendants] established that they did not design, manufacture or sell the allegedly defective product and thus could not be held liable . . . and plaintiffs failed to raise a triable issue of fact" (quotation marks omitted)); *Townley v. Emerson Elec. Co.*, 702 N.Y.S.2d 728, 729 (App. Div. 2000) (same); *Passaretti*, 607 N.Y.S.2d at 689 (same).  Simply put, AJJ may not be held liable for parts that AJJ did not manufacture and whose remaining liability was duly transferred to another company. Accordingly, the Court grants AJJ's motion for summary judgment against Plaintiffs and dismisses AJJ from the instant Action.[21]

### 2.  Plaintiffs' Motion for Summary Judgment

Plaintiffs move for summary judgment against FCA on their strict products liability claim as well as moving for summary judgment to dismiss all Defendants' comparative negligence and assumption of risk defenses.  (*See* Pls. Mem. 2–3.)

### a.  Strict Products Liability: Manufacturing Defect

"A manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable."  *Colon ex. rel. Molina v. BIC USA Inc.*, 199 F. Supp. 2d 53, 82 (S.D.N.Y. 2001) (quoting *Amatulli v. Dehli Const. Corp.*, 571 N.E.2d 645, 648 (N.Y. 1991)).  "In New York, a product is considered defective, and the manufacturer liable, if the product: (1) contains a manufacturing flaw, (2) is defectively designed, or (3) is not accompanied

---

[21] As discussed *supra* note 1, because the Court grants AJJ's motion for summary judgment against Plaintiffs, the Court declines to rule on AJJ's motions for summary judgment against FCA and YFAI as AJJ is no longer a party to the litigation.  Given this, the Court will analyze the remaining motions for summary judgment, disregarding references to AJJ.

by adequate warnings for the use of the product." *Matter of Eighth Judicial Dist. Asbestos Litig.*, 129 N.E.3d 891, 895–96 (N.Y. 2019) (quotation marks and citation omitted).

Though Plaintiffs argue for summary judgment against FCA for strict liability pursuant to a manufacturing defect in the alternative to their design defect claim, (*see* Pls.' Mem. 12–13), the Court will first address the manufacturing defect theory. In a claim for manufacturing defect, a plaintiff "must prove that the product failed to perform in the intended manner due to a flaw in the manufacturing process." *Gambardella v. Tricam Indust. Inc.*, No. 18-CV-10867, 2020 WL 5548825, at *7 (S.D.N.Y. Sept. 16, 2020) (quotation marks and citation omitted). To do this, a plaintiff must show that a specific product unit was defective (1) "as a result of some mishap in the manufacturing process itself, improper workmanship, or because defective materials were used in construction" and (2) "that the defect was the cause of plaintiff's injury." *Bustamante v. Atrium Medical Corp.*, 18-CV-8395, 2020 WL 583745, at *6 (S.D.N.Y. Feb. 6, 2020) (quotation marks and citation omitted); *see also Colon*, 199 F. Supp. 2d at 85 (same). "In other words, a manufacturing flaw exists when the unit in question deviates in quality and other performance standards from all of the other identical units." *Gambardella*, 2020 WL 5548825, at *7 (quoting *Colon*, 199 F. Supp. 2d at 85).

Plaintiffs argue that they are entitled to summary judgment because the "'cavities' used to mold the MPR cover were producing covers that did not meet dimensional requirements," which was a defective material used in construction leading to W.S.R.'s injury. (*See id.* at 13.) In its Opposition, FCA failed to respond to this theory entirely. (*See generally* FCA's Pls. Opp.) Since FCA is represented by counsel in this matter, the Court deems this claim abandoned. *See Kovaco v. Rockbestos–Surprenant Cable Corp.*, 834 F.3d 128, 144 (2d Cir. 2016) (holding that the counseled plaintiff abandoned certain claims because the plaintiff's brief in opposition was

"bereft of any *mention* of the purported . . . claims, let alone argument why these claims should survive summary judgment" (emphasis in original)); *Jackson v. Federal Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.")).  Accordingly, Plaintiffs' Motion regarding FCA's strict liability under a manufacturing defect theory must be granted.

### b.  Strict Products Liability: Design Defect

In a claim for design defect, a plaintiff establishes a prima facie case under New York law "by showing (1) that the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing plaintiff's injury." *Figueroa v. W.M. Barr & Co.*, 18-CV-11187, 2020 WL 5802196, at *4 (S.D.N.Y. Sept. 29, 2020) (quotation marks and citation omitted); *see also Bustamante*, 2020 WL 583745, at *5 (same); *Am. Guarantee & Liab. Ins. Co. v. Cirrus Design Corp.*, No. 09-CV-8357, 2010 WL 5480775, at *3 (S.D.N.Y. Dec. 30, 2010) (same).  "The first two prongs are generally analyzed together as a single inquiry, requiring the factfinder to determine whether a product is 'reasonably safe.'" *Figueroa*, 2020 WL 5802196, at *4 (quoting *Colon*, 199 F. Supp. 2d at 84); *see also Zsa Zsa Jewels, Inc. v. BMW of North America, LLC*, 419 F. Supp. 3d 490, 507 (E.D.N.Y. 2019) ("The first two elements are usually analyzed together and merge into a single inquiry[.]"); *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983) (noting that a plaintiff  "must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe").  Under the third prong, a plaintiff is required to show "that the defectively designed product caused his injury and that the defect was the proximate cause of the

injury." *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 42 (E.D.N.Y. 2010) (quotation marks omitted) (citing *Voss*, 450 N.E.2d at 209). "Usually, whether or not a defect was indeed a substantial factor is a matter for the trier of fact to decide." *Id*. (citation omitted).

Plaintiffs raise three arguments to support their design defect claims: 1) that FCA "concedes" that the RU "contains a safety defect . . . in violation of FMVSS 114," (Pls.' Mem. 6–9); 2) that FCA "agrees that it was feasible to design the MPR cover in a safe manner," (*Id*. at 9–10); and 3) that the design defect was a substantial factor in causing W.S.R.'s injuries, (*see id.* at 10–12). As the first two arguments address the first two factors of this inquiry, the Court will address them together. *See Figueroa*, 2020 WL 5802196, at *4 (noting that "[t]he first two prongs are generally analyzed together as a single inquiry").

The thrust of Plaintiffs' claim that the RU, "as designed, posed a substantial likelihood of harm" is that FCA's alleged noncompliance with FMVSS 114, coupled with the subsequent recall of the car, represents incontrovertible evidence that the car contained an unreasonably unsafe design defect. (Pls.' Mem. 6–9 (citing *Figueroa*, 2020 WL 5802196, at *4).) In response, FCA argues that evidence of a recall alone is "not automatically a [design] defect[,]" especially where this recall was "precipitated by a failure to meet an administrative compliance standard." (FCA's Pls. Opp. 8–9.)

FCA is correct that evidence of a recall, on its own, cannot prove that a product is defectively designed. *See Goldin v. Smith & Nephew, Inc.*, No. 12-CV-9217, 2013 WL 1759575, at *4 (S.D.N.Y. Apr. 24, 2013) ("The bare fact of the voluntary recall does not suffice to prove a design defect."); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 404–05 (S.D.N.Y. 2013)

(same).[22]  FCA is also correct that non-compliance with FMVSS 114 is "evidence of a defect,

but do[es] not constitute a defect per se."  *Zsa Zsa Jewels, Inc.*, 419 F. Supp. 3d at 509

(collecting cases); *see also id.* ("A plaintiff may establish that a product design is defective by

showing that it violates applicable product safety laws.  In this regard, under New York law, it

matters whether the violation is statutory or regulatory in nature."); *Cappellini v. McCabe*

*Powers Body Co.*, 713 F.2d 1, 5 (2d Cir. 1983) (stating that a regulatory violation "merely

constitutes some evidence of negligence") (quotation marks and citations omitted); *Elliott v. City*

*of New York*, 747 N.E.2d 760, 762 (N.Y. 2001) ("As a rule, violation of a State statute that

imposes a specific duty constitutes negligence per se, or may even create absolute liability.  By

contrast, violation of an [administrative rule or regulation] constitutes only evidence of

negligence." (citations omitted)); *Khan v. Bangla Motor and Body Shop, Inc.*, 813 N.Y.S.2d 126,

129 (App. Div. 2006) (stating that "a violation of [federal] regulations provides evidence of

negligence" (citations omitted)); *Cruz v. Long Island Rail Road Co.*, 803 N.Y.S.2d 91, 94 (App.

Div. 2005) ("A violation of a safety regulation may be considered as some evidence of

negligence." (citation omitted)).[23]  However, FCA fails to address any of the undisputed facts

---

[22] Plaintiffs seemingly argue that this case law is not applicable because a "recall is not voluntary" in the instant Action.  (*See* Pls.' Reply Mem. 5 & n2.)  However, Plaintiffs cite no applicable New York or federal case law to this effect, nor has the Court identified any.  Moreover, Plaintiffs fail to even engage with established New York law on "voluntary" recalls, which would be a relevant corollary in this inquiry.  And as discussed more below, the Court is not persuaded that this difference is material, given settled New York law regarding the effect of regulatory violations and potential negligence.

[23] The Court must also note that Plaintiffs incorrectly state New York law in response to FCA.  Plaintiffs argue that "[f]ailure to comply with a safety statute means the vehicle is unreasonably dangerous under the law."  (Pls.' Reply Mem. 5.)  Plaintiffs cite to the Third Restatement of Torts as support of this claim.  (*Id.* quoting Restatement (Third) of Torts: Products Liability § 4 ("In connection with liability for defective design or inadequate instructions or warnings[,] a product's noncompliance with an applicable product safety statute

presented by Plaintiffs as it relates to this part of the design defect inquiry.  (*See generally* FCA

Pls.' Opp. 8–11.)  Moreover, in an effort to repeatedly argue that each of Plaintiffs' claims only

represents "some evidence of negligence" and "does not and cannot establish negligence as a

matter of law," (*id*. at 8), FCA fails to consider or provide any argument to the contrary that,

taken together, Plaintiffs have established the existence of a design defect.  While the Court may

agree that no one theory—whether the violation of FMVSS 114, the recall, or other cited

evidence—establishes negligence per se, Plaintiffs are correct that the *overwhelming* evidence as

discussed below indicates that the RU, as designed, contained a defect.

Plaintiffs' argument that the MPR cover violates FMVSS 114 derives from three sources:

the text of the provision itself, various investigations and reports conducted by FCA and YFAI,

and the existence of the recall premised on FMVSS 114 that began in June 2018.  (Pls.' Mem. 6–

9.)  FMVSS 114 is a product safety standard that "specifies vehicle performance requirements

intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor

vehicles."  49 C.F.R. § 571.114, S1.  As relevant to the instant Action, FMVSS 114 states:

> The vehicle may have a device by which the user can remove the gear selection
> control from "park" after the key has been removed from the starting system.  This
> device must be operable by . . . a means other than the key, provided steering or
> forward self-mobility is prevented when the key is removed from the starting
> system.  This device must be covered by an opaque surface which, when installed:

---

or administrative regulation renders the product defective with respect to the risks sought to be
reduced by the statute or regulation[.]")).)

As a matter of New York law, Plaintiffs' attempt at drawing a direct inference to the
Restatement is categorically incorrect.  As discussed *supra*, New York law "differs from both the
Restatement and the overwhelming majority of American courts" by imposing an additional
inquiry to violations of product safety regulations.  *Zsa Zsa Jewels Inc.*, 419 F. Supp. 3d at 509
n.11 (quotation marks and citation omitted); *see also Cappellini*, 713 F.2d at 4–5 ("Under New
York law . . ., which applies to this diversity action, a regulatory violation does not establish
negligence *per se*, but merely constitutes some evidence of negligence, which the jury could take
into consideration with all other evidence bearing on that subject" (quotation marks and citation
omitted)).  Thus, Plaintiffs erred by ignoring clear New York law to the contrary.

> prevents the sight of and use of the device, and can be removed only by using a
> screwdriver or other tool.

*Id*. at § 571.114, S5.2.4(c).

At first glance, the plain reading of the regulatory text may support Plaintiffs' assertions: if this device can be removed by using something other than a "tool," it violates FMVSS 114. *See id*. (stating that the device "can be removed *only* by using a screwdriver or other tool" (emphasis added)). Plaintiffs cite several relevant pieces of undisputed evidence to bolster their claim. For example, Plaintiffs note that FCA "received additional reports of the MPR door/plug coming loose," and this remains undisputed by all Parties. (Pls.' 56.1 ¶ 65; FCA's Resp. to Pls.' 56.1 ¶ 65; AJJ's Resp. to Pls.' 56.1 ¶ 65; YFAI's Resp. to Pls.' 56.1 ¶ 65; *see also* Pls.' Mem. 6.)[24] Moreover, there is no genuine dispute regarding the extensive investigation undertaken by FCA in March 2018, specifically tasked with reviewing "the MPR issue." (Pls.' 56.1 ¶ 101; FCA's Resp. to Pls.' 56.1 ¶ 101; AJJ's Resp. to Pls.' 56.1 ¶ 101; YFAI's Resp. to Pls.' 56.1 ¶ 101.) Strikingly, the investigator assigned to review the MPR determined that "[a]pparently Interior did not know you had to have a tool to remove the 'door' (the regulation) because the tether-ratchet-cable mechanism belongs to Chassis. Once they knew, they increased the amount of force required to remove the door so you had to have a tool." (Pls.' 56.1 ¶ 104; FCA's Resp. to Pls.' 56.1 ¶ 104; AJJ's Resp. to Pls.' 56.1 ¶ 104; YFAI's Resp. to Pls.' 56.1 ¶ 104.) Just five days later, the investigator wrote in his records that FCA has "a compliance issue with FMVSS 114, S 5.2.4 (c)" that was "undetectable to [the] driver," a consequence of which the investigator noted could be "inadvertent vehicle movement" that "may result in injury to bystanders, and case [sic] cause vehicle crash without prior warning." (Pls.' 56.1 ¶¶ 102–103, 108–109; FCA's Resp.

---

[24] As discussed *supra* note 7, FCA's dispute does not substantively undermine the factual allegation.

to Pls.' 56.1 ¶¶ 102–103, 108–109; AJJ's Resp. to Pls.' 56.1 ¶¶ 102–103, 108–109; YFAI's

Resp. to Pls.' 56.1 ¶¶ 102–103, 108–109.)  The Parties' underlying dispute, whether the "root

cause" listed in the notes is because of "Chrysler Design" or "supplier design," is irrelevant to

the question at hand.  Simply put, the MPR cover in Plaintiffs' vehicle violated FMVSS 114.

(*See* Pls.' 56.1 ¶ 113 (citing testimony that "all saleable vehicles manufactured from the start of

production until April 6, 2018, which would include [Plaintiffs'] vehicle, were affected by the

defect."); FCA's Resp. to Pls.' 56.1 ¶ 113 (same); AJJ's Resp. to Pls.' 56.1 ¶ 113 (same);

YFAI's Resp. to Pls.' 56.1 ¶ 113 (same).)[25]

     Importantly, FCA seems to have agreed that the RU violated FMVSS 114.  Based on the

investigation, FCA's VSRC "initiate[d] a recall for 2017 and 2018 Pacifica vehicles . . . to install

new MPR plugs that had a more secure fit and could not be opened with a finger."  (Pls.' 56.1 ¶¶

117, 118; FCA's Resp. to Pls.' 56.1 ¶¶ 117, 118; AJJ's Resp. to Pls.' 56.1 ¶¶ 117, 118; YFAI's

Resp. to Pls.' 56.1 ¶¶ 117, 118.)[26]  FCA then notified the NHTSA of the recall on June 20,

2018—just four days before the incident giving rise to this Action.  (Pls.' 56.1 ¶ 119; AJJ's Resp.

to Pls.' 56.1 ¶ 119; YFAI's Resp. to Pls.' 56.1 ¶ 119.)  Among several other relevant descriptions

of the defect, (*see* Pls.' 56.1 ¶ 121–124, 126; FCA's Resp. to Pls.' 56.1 ¶ 121–124, 126; AJJ's

Resp. to Pls.' 56.1 ¶ 121–124, 126; YFAI's Resp. to Pls.' 56.1 ¶ 121–124, 126), the "dealer

service instructions for the recall" puts this in stark terms:

     The condition described . . . does not comply with Federal Motor Vehicle Safety
     Standard (FMVSS) No. 114 Theft Protection and Rollaway Prevention which

---

[25] As discussed above, FCA's dispute here arises from a semantic and legal argument—not a factual dispute as is the purpose of Rule 56.1 statements—and is thus disregarded by the Court.

[26] As discussed, FCA's argument that evidence of this recall violates Federal Rule of Evidence 407 is not persuasive.  *See supra* note 10.

requires that if a gear selection control override option (MPR) is present, the device can only be removed (accessed) by using a screwdriver or other tool.

(Pls.' 56.1 ¶ 127; FCA's Resp. to Pls.' 56.1 ¶ 127; AJJ's Resp. to Pls.' 56.1 ¶ 127; YFAI's Resp. to Pls.' 56.1 ¶ 127.)  Given the safety investigation, the violation of FMVSS 114, and the subsequent recall, Plaintiffs have met their burden to establish that the MPR covers were likely defective, as required by the first two parts of this inquiry.

However, "[e]ven where a plaintiff has established that a product was defective by virtue of its noncompliance with applicable statutes or regulations, they must still prove that this defect was the cause of their injury." *Zsa Zsa Jewels, Inc*., 419 F. Supp. 3d at 509 (citation omitted); *see also Rupolo*, 749 F. Supp. 2d at 42 ("The plaintiff is required to show that the defectively designed product caused his injury and that the defect was the proximate cause of the injury." (quotation marks omitted) (citing *Voss*, 450 N.E.2d at 209)).  Plaintiffs argue that there is "no doubt that the safety design defect was a substantial factor in causing W.S.R. injuries," because if "the MPR [had] been properly designed and complied with FMVSS 114, W.S.R. would not have been able to open the cover and activate the MPR."  (Pls.' Mem. 10.)  FCA argues that there are several factual disputes regarding W.S.R.'s conduct during the incident in question, including expert evidence of "surrogate testing" involving children "comparable to [W.S.R.'s] size and age on 3 exemplar Pacifica vehicles," as well as additional testimony about possible "gouge/scratch markings on the MPR cover."  (FCA's Pls.' Opp. 4–8.)[27]  For the reasons stated

---

[27] In the relevant motion papers, there is a brewing dispute between Plaintiffs and FCA as to whether Eric Asselin, an expert for YFAI, is an "expert" for the purposes of analyzing scratches and other markings on an MPR cover.  (*See* FCA's Pls. Opp. 5–7; Pls.' Reply Mem. 6–9.)  Plaintiffs vociferously argue that FCA's references to Mr. Asselin's testimony violated Federal Rule of Civil Procedure Rule 26(a)(2)(B) requiring the disclosure of a written report "of all opinions the witness will express and the basis and the reasons for them," that the testimony also violated Federal Rule of Evidence 702, and that FCA ignored "this Court's directives for

below, the Court finds that there is a genuine dispute of fact about the proximate cause of W.S.R.'s injury.

Throughout the instant Motion, Plaintiffs cite at least three sources of evidence that are relevant to this inquiry: 1) W.S.R.'s testimony (and related corroborating testimony) stating that "he opened the MPR cover . . . with his pinky finger and pulled the 'orange string' attached to it[,]" (Pls.' Mem. 11); 2) a prior incident in which a seven-year-old-child allegedly accessed an MPR cover without a tool, (*see id.* at 6–7); and 3) FCA's recall of the MPR covers, (*see id.* at 8–9). W.S.R.'s testimony plainly ties the cover's defect to his injury: without the defect that allowed the MPR cover to be removed without a tool, W.S.R. allegedly would not have been able to open the cover, pull the string, and manually place the car in neutral. (*See* Fogel Decl. in Opp. to Pls.' Mot. Ex C., at 37:8–10 (Dkt. No. 267-4) ("I tried to open it with my first finger. It wouldn't open. So, I used my pinky. Then it opened.").) In addition, Plaintiffs cite a similar incident where a seven year old "noticed a tiny panel that can be popped own easily," opened the MPR cover, and pulled the orange pull cord. (Giannetta Decl. Ex. O (Dkt. No. 250-36) at 2.;

---

identifying experts and serving reports. (Pls.' Reply Mem. 7–9; *see also* Third Am. Case Mgmt. and Scheduling Order (Dkt. No. 111).)

At the summary judgment stage, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages*, 164 F.3d at 746. "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers*, 842 F.2d at 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (citation omitted)). A court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]" *Gjini v. United States*, No. 16-CV-3707, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) (quoting *Bah v. Nordson Corp.*, No. 00-CV-9060, 2005 WL 1813023, *6 (S.D.N.Y. Aug. 1, 2005)).

However, because there exists a separate genuine factual dispute in the instant Motion, the Court declines to wade into these waters. Nevertheless, the Court notes that this is exactly the type of inquiry ripe for a future Daubert hearing or to be determined at trial.

Pls.' 56.1 ¶¶ 83; FCA's Resp. to Pls.' 56.1 ¶¶ 83; AJJ's Resp. to Pls.' 56.1 ¶¶ 83; YFAI's Resp. to Pls.' 56.1 ¶¶ 83.)  In FCA's New Customer Assistance Inquiry Record about this October 2017 incident, the customer stated that "nothing special is needed to pop it open," again raising questions as to whether the MPR cover in fact needed a tool.  (*See* Giannetta Decl. Ex. O at 2; Pls.' 56.1 ¶¶ 83; FCA's Resp. to Pls.' 56.1 ¶¶ 83; AJJ's Resp. to Pls.' 56.1 ¶¶ 83; YFAI's Resp. to Pls.' 56.1 ¶¶ 83.)  Moreover, the "Description of the Safety Risk" in the subsequent Recall Report ties the harm from the defect to W.S.R.'s injury, stating that "[i]f the MPR is unintentionally actuated, it could result in inadvertent vehicle movement.  Inadvertent vehicle movement may result in injury to bystanders, and can cause vehicle crash without prior warning."  (Pls.' 56.1 ¶ 124; FCA's Resp. to Pls.' 56.1 ¶ 124; AJJ's Resp. to Pls.' 56.1 ¶ 124; YFAI's Resp. to Pls.' 56.1 ¶ 124.)

Setting aside the disputed relevance of the gouge/scratch markings on the MPR cover, FCA proffers expert testimony that questions W.S.R's conduct, raising a genuine dispute as to proximate cause of the injury.  FCA's "biomechanical expert" performed "surrogate testing," asking children similarly situated to W.S.R. to open the MPR cover.  (FCA's Pls. Opp. 7–8.)  In this test, out of 30 attempts across three different exemplar vehicles, "not a single one of the surrogates was able to open the MPR cover . . . using his pinky finger."  (*Id*. at 7 (emphasis omitted).)  Plaintiffs incorrectly state that "whether other children are capable of opening the cover is irrelevant to whether" W.S.R. did.  (Pls.' Reply Mem. 9.)  In fact, it is *directly* relevant: it raises a question as to whether the MPR cover, with the identified defect, indeed could have been the proximate cause of W.S.R.'s injury.  If the defective cover could not be opened by a child, which this expert testimony disputes, then it cannot be the proximate cause of W.S.R.'s injury.  Most important, however, is that it is not the role of this Court to decide which piece of

evidence is the most credible upon summary judgment—in fact, it would be improper.  The

Court is tasked with "assess[ing] whether there are any factual issues to be tried."  *Brod*, 653

F.3d at 164 (quotation marks omitted).  In sum, a genuine dispute of material fact exists as to

whether the MPR cover design defect was the proximate cause of W.S.R.'s injuries, and thus

summary judgment is inappropriate on this claim.

### c.  Strict Products Liability: Failure to Warn

Finally, Plaintiffs raise a third strict products liability theory, arguing that FCA is liable

for its failure to warn of the defect that allegedly "caused W.S.R.'s injuries."  (Pls.' Mem. 13.)

In a claim for failure-to-warn, "a plaintiff may assert that a product is defective because the

manufacturer failed to provide adequate warnings regarding the risks and dangers associated

with the use, or foreseeable misuse, of its product."  *Gambarella*, 2020 WL 5548825, at *7

(quotation marks and citation omitted); *see also Lara v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d

719, 741 (E.D.N.Y. 2016) (same).  "To state a claim for failure to warn under New York law, a

plaintiff must show '(1) that a manufacturer has a duty to warn; (2) against dangers resulting

from foreseeable uses about which it knew or should have known; and (3) that the failure to do

so was the proximate cause of harm.'"  *Bocoum v. Daimler Trucks North America LLC*, No. 17-

CV-7636, 2022 WL 902465, at *28 (S.D.N.Y. Mar. 28, 2022) (quoting *Colon*, 199 F. Supp. 2d at

84).  Because "[f]ailure to warn is typically a fact-intensive inquiry for the jury to decide," "a

court must deny a failure to warn claim as a matter of law where only one conclusion can be

drawn from the established facts."  *Colon*, 199 F. Supp. 2d at 85; *see also Liriano v. Hobart

Corp.*, 700 N.E.2d 303, 309 (N.Y. 1998) ("Failure-to-warn liability is intensely fact-specific,

including but not limited to such issues as feasibility and difficulty of issuing warnings in the

circumstances; obviousness of the risk from actual use of the product; knowledge of the

particular product user; and proximate cause."); *Johnson v. Johnson Chem. Co., Inc.*, 588

N.Y.S.2d 607, 610 (App. Div. 1992) ("Whether a particular way of misusing a product is

reasonably foreseeable, and whether the warnings which accompany a product are adequate to

deter such potential misuse, are ordinarily questions for the jury." (citations omitted)).

"Although '[t]he sufficiency of a warning is generally a question of fact to be determined at trial

. . . a plaintiff has the burden of proving that the absence of an adequate warning proximately

caused his injury.'" *Gambarella*, 2020 WL 5548825, at *7 (alterations in the original) (quoting

*Lara*, 174 F. Supp. 3d at 742).

Plaintiffs argue that FCA is liable for failure to warn based on three failed "duties": 1)

"FCA had a duty to warn consumers about the . . . defect . . . by January [] 2017 when FCA first

became aware of the defect," 2) "FCA had a [] duty to warn consumers . . . in August [] 2017

when FCA re-designed the MPR cover to include a higher pull out force," and 3) "FCA [had a]

duty to warn consumers . . . after receiving notice of the similar October 2017 incident."  (Pls.'

Mem. 14.)  FCA argues that it "adequately warned to prevent the accident, but the adult plaintiffs

failed to heed the warnings given," and dispute the facts cited by Plaintiffs as to FCA's early

knowledge of an MPR cover defect.  (FCA's Pls. Opp. 11–16.)  While Plaintiffs and FCA have

multiple disputes regarding when FCA's duty to warn began, *see* supra I.A.1.c., it is again the

proximate cause factor that dooms Plaintiffs' arguments.  For the reasons stated below, the Court

finds that there are several disputed facts about the adequacy of the warnings themselves, thus

making summary judgment inappropriate at this time.

"To recover on a strict products liability cause of action based on inadequate warnings, a

plaintiff must prove causation, i.e. that if the adequate warnings had been provided, the product

would not have been misused."  *Kosta v. WDF, Inc.*, 167 N.Y.S.3d 145, 148 (App. Div. 2022)

45

(citation omitted).  "In other words, '[f]or there to be recovery for damages stemming from a product defective because of the inadequacy or absence of warnings, the failure to warn must have been a substantial cause of the events which produced the injury.'"  *Id*. (quoting *Reece v. J.D. Posillico, Inc.*, 83 N.Y.S.3d 672, 676 (App. Div. 2018)).  "Liability for failure to warn may be imposed based upon either the complete failure to warn of a particular hazard or the inclusion of warnings that are insufficient."  *Bocoum*, 2022 WL 902465, at \*28 (quoting *Fisher v. Multiquip, Inc.*, 949 N.Y.S.2d 214, 218 (App. Div. 2012)).

Here, there are disputed facts that could lead to numerous determinations of proximate cause, counseling against summary judgment at this time.  For example, FCA provided expert testimony that their warnings were adequate, citing at least three "relevant safety messages" provided to Pacifica owners that instructed users to take safety measures to prevent cars from rolling including "[a]lways apply[ing] the parking brake fully when parked to guard against vehicle movement and possible injury or damage."  (FCA's Pls. Opp. 12.)  Moreover, the manual park release instructions included in the User Guide contains a large warning which stated, among other things: "Activating the Manual Park Release will allow your vehicle to roll away if it is not secured or properly connected to a tow vehicle.  Activating the Manual Park Release on an unsecured vehicle could lead to serious injury or death for those in or around the vehicle."  (Fogel Decl. in Opp. to Pls.' Mot. Ex J., at 8–9 (Dkt. No. 267-12).)  FCA's expert addressed this and other warnings together, concluding:

> Safety information is conveyed by both the section warning as well as the description and procedure for activating the MPR.  This information explicitly alerts readers that activating the MPR shifts the vehicle from Park to Neutral and that if the vehicle is not secured (by brake pedal, Park Brake, or other means) it can roll away.  The safety messages are clear and consistent with the general human factors guidance for preparing written safety messages.  The safety messages explicitly remind readers of the intuitive risk of injury from a vehicle rollaway.  Readers of these safety messages would understand the nature of the hazard (i.e.,

death or serious injury), and the means of avoiding the risk (i.e., setting the parking brake, putting the vehicle in Park, not allowing unattended children in the vehicle, and locking the unattended vehicle).

(*Id*. at 10.)  Nevertheless, Plaintiffs argue that these warnings are insufficient, because FCA had a duty to provide a *specific* warning regarding the MPR defect, which did not occur until consumers were notified of the recall.  (*See* Pls.' Mem. 14–15.)[28]  Plaintiffs state that this warning is "necessary because access to the MPR would allow the vehicle to shift gears without the use or presence of the key" and the "consumer would have felt safe because the ignition key was in the house and reasonably believed that the car could not start or change gears (and roll away) without it."  (Pls.' Reply Mem. at 10.)  However, Plaintiffs fail to engage with the warnings identified by FCA's expert, which cast doubt on Plaintiffs claim that a user would "reasonably believe" the car would not roll away, even if the ignition key was indoors.  Indeed, FCA identified the risk of roll away with the RU in several different locations, bolstered by the repeated warnings to "[a]lways apply the parking brake."  (FCA's Pls. Opp. 12–14.)  Moreover, FCA put forth numerous MPR specific warnings indicating that there is a risk of injury or death if used improperly.  The Court agrees with FCA: there is a genuine dispute as to whether adequate warnings were provided.  As New York law notes, "if the adequate warnings had been provided, the product would not have been misused" as a matter of law.  *Kosta*, 167 N.Y.S.3d at 148.

It is not the Court's role at summary judgment to determine whether warnings were adequate, or whether the failure to include a single warning is enough in the face of other warnings.  *See Gambardella*, 2020 WL 5548825, at *7 ("[T]he sufficiency of a warning is

---

[28] While Plaintiffs repeatedly state that this notification occurred in August 2018, (*see* Pls.' Mem. 2, 15), the Court is unable to identify any evidence in the record to corroborate this claim.  However, this is not material to the present inquiry.

generally a question of fact to be determined at trial."). Given this "fact-intensive inquiry" with several disputed facts, the Court denies Plaintiffs' motion for summary judgement for failure to warn. *See Hunter v. Shanghai Huangzhou Elec. Appliance Mfg. Co.*, 505 F. Supp. 3d 137, 156 (N.D.N.Y. 2020) (dismissing failure to warn claim where plaintiff failed to "allege any specific facts regarding what warnings, if any, *were* provided with the [product], and why such warnings were inadequate" (emphasis in original)); *Vasquez v. Ridge Tool Pattern Company*, 169 N.Y.S.3d 57, 60 (App. Div. 2022) ("[E]ven if a product user has some degree of knowledge of the potential hazards in the use of a product, summary judgment will not lie where reasonable minds might disagree as to the extent of the knowledge." (quotation marks omitted) (citing *Public Adm'r of Bronx Cty. v. 485 E. 188th St. Realty Corp.*, 981 N.Y.S.2d 381, 387 (App. Div. 2014)); *Johnson*, 588 N.Y.S.2d at 610 ("Whether a particular way of misusing a product is reasonably foreseeable, and whether the warnings which accompany a product are adequate to deter such potential misuse, are ordinarily questions for the jury." (citations omitted)).

### d.  Affirmative Defenses

Plaintiffs assert that they are entitled to summary judgment on FCA and YFAI's affirmative defenses asserting parental comparative negligence, failure to supervise, and assumption of the risk. (*See* Pls.' Mem. 15–21.) Specifically, Plaintiffs seek to dismiss FCA's First (misuse), Third and Fourth (culpable conduct), and Fourteenth (failure to use parking brake) affirmative defenses, and YFAI's First (culpable conduct), Sixth (misuse), Fifteenth (failure to use parking brake), and Sixteenth (parental failure to supervise) affirmative defenses. (*See id.* at 19, 21 (citing FCA Answer ¶¶ 153, 155–56, 166; YFAI Answer 13–15).) [29]

---

[29] The Court notes that, because FCA and YFAI's affirmative defenses lack detail and specificity, it is not clear which of their affirmative defenses apply to W.S.R.'s conduct and

### i. Parental Comparative Negligence

Plaintiffs argue that Defendants' affirmative defenses asserting parental comparative negligence are precluded by New York General Obligations Law ("GOL") § 3-111.  (*See* Pls.' Mem. 15–16.)  The Court agrees.  GOL § 3-111 states, "In an action brought by an infant to recover damages for personal injury the contributory negligence of the infant's parent or other custodian shall not be imputed to the infant."  *Wilson v. Westmoreland Farm, Inc.*, 989 F. Supp. 451, 452 (E.D.N.Y. 1998) (quoting GOL § 3-111); *Roberts ex rel. Gillespie v. Chaim Yanko, LLC*, No. 12877/08, 971 N.Y.S.2d 74 (unpublished table opinion), 2013 WL 1442226, *5 (N.Y. Sup. Ct. 2013) (same); *see also Kelly v. Metro. Ins. & Annuity Co.*, 918 N.Y.S.2d 50, 55 (App. Div. 2011) (noting that GOL § 3-111 "expressly prohibits the imputation of a parent's contributory negligence to an infant plaintiff").  Thus, Defendants' affirmative defenses predicated on a theory of parental comparative negligence plainly fail under GOL § 3-111 and are therefore dismissed.

### ii. Failure to Supervise

Similarly, "[t]he rule in New York is that a defendant who negligently injures a child cannot avoid liability to the child by asserting a claim against the parent for negligent supervision of the child."  *Banks by Banks v. United States*, 969 F. Supp. 884, 894 (S.D.N.Y. 1997) (citations omitted); *see also Patton v. Carnrike*, 510 F. Supp. 625, 627 (N.D.N.Y. 1981) ("New York . . . has recently reaffirmed that it will not recognize a tort or defense grounded in parents' failure to supervise children.") (collecting cases); *Roberts*, 2013 WL 1442226 at *5

---

which apply to the Richardson's conduct.  (*See* FCA Answer ¶¶ 153, 155–56; YFAI Answer 13–15.)  The Court agrees with Plaintiffs' categorization of these affirmative defenses.  That is, the Court construes FCA and YFAI as raising three categories of affirmative defenses against W.S.R. and the Richardsons: 1) parental comparative negligence, 2) failure to supervise, and 3) assumption of the risk.  The Court will analyze each of these categories accordingly.

("GOL § 3-111 codifies the general rule that a mere negligent supervision of a child is not actionable." (citation omitted)); *Martinez v. Kaz USA, Inc.,* 121 N.Y.S.3d 880, 881 (App. Div. 2020) ("There is no legally cognizable cause of action to recover damages for injuries suffered by a minor child against his or her parent for negligent supervision[.]") (collecting cases).

However, "[t]he negligent supervision[] rule is subject to a narrow exception: contribution against the parent is available 'where the parent's conduct toward his child would be a tort if done by one ordinary person to another.'" *Roberts*, 2013 WL 1442226 at *5 (quoting *Holodook v. Spencer*, 324 N.E.2d 338, 345 (N.Y. 1974)); *see also Maldonado v. Newport Gardens, Inc.*, 937 N.Y.S.2d 260, 262 (App. Div. 2012) (finding that exception applied where a child was injured in apartment fire caused by the mother who left an almost entirely burnt candle unattended while she was gone, while the child remained locked in the apartment, because the mother owed a duty to "anyone who may have been in the apartment"); *Hoppe v. Hoppe*, 724 N.Y.S.2d 65, 66 (App. Div. 2001) (finding exception applied where child was injured by explosive nail gun cartridge obtained from parent because "duty not to negligently maintain explosives is a duty owed to all and is not simply a duty emanating from the parent-child relationship"). "The 'factor that distinguishes' instances in which actionable negligence has been found from 'action[s] predicated solely upon negligent parental supervision is the scope of the duty—a duty ordinarily owed apart from the family relationship—and not the fact the dangerous condition was created by an affirmative act of the parent.'" *Ruffing ex rel. Calton v. Union Carbide Corp.*, 720 N.Y.S.2d 328, 334 ( Sup. Ct. 2000) (emphasis omitted) (quoting *Grivas v. Grivas*, 496 N.Y.S.2d 757, 760 (App. Div. 1985)).

Here, FCA and YFAI do not appear to dispute that, on the day of the accident, the RU was parked in the driveway of the Richardson's house.  (FCA's Resp. to Pls.' 56.1 ¶ 21; YFAI's

Resp. to Pls.' 56.1 ¶ 21.)  Similarly, FCA and YFAI do not appear to dispute that the keys to the

RU were inside the house at the time of the accident.  (*See* FCA's Resp. to Pls.' 56.1 ¶ 22;

YFAI's Resp. to Pls.' 56.1 ¶ 22.)  That the keys were inside the house is supported by William

Richardson's deposition:

> Q: Do you recall how many sets of keys you had for the vehicle?
>
> A: We had two keys.
>
> Q: And do you know if both sets of keys were in the house?
>
> A: Yes, they were hanging . . . we have a specific spot they hand on in our laundry
> room at the time.

(Fogel Decl. in Supp. of Pls.' Mot. I Ex. T, at 52:14–21 (Dkt. No. 231-19).)  And, that the RU

was parked in the driveway is further supported by William Richardson's deposition.  (*See* Fogel

Decl. in Supp. of Pls.' Mot. I Ex. R, at 39:4–24 (Dkt. No. 231-18).)  Given that the RU was

parked in the driveway while the keys were in the house, the Court finds that the facts at hand are

easily distinguishable from cases such as *Maldonado* or *Hoppe*, in which the parents created an

environment that was dangerous for the public at large by leaving a candle burning in an

apartment or leaving out an explosive nail gun cartridge.  And, unlike in *Nolechek v. Gesuale*,

385 N.E.2d 1268 (N.Y. 1978), where a father was held liable for providing his partially blind 16-

year-old son with a motorcycle, the Richardsons did not "provide" W.S.R. with a car—it was

merely parked in the driveway with the keys inside.

That the RU did not have its parking brake engaged does not change this analysis.  The

Court finds that failure to engage a parking brake does not amount to a "rare, exceptional

exposure" justifying the application of the exception.  *LaTorre v. Genesee Mgmt., Inc.*, 687

N.E.2d 1284, 1287 (N.Y. 1997).  Indeed, "*LaTorre* made clear that parental liability for

negligent entrustment is limited to circumstances where a parent's conduct creates a

particularized danger to third persons that is plainly foreseeable." *Rios v. Smith*, 744 N.E.2d 1156, 1160 (N.Y. 2001). The New York Court of Appeals found in *Rios* that a father's conduct created a foreseeable and particularized danger where he "was aware that his sons had driven [his] ATVs in the past with passengers on the vehicles," "it was likely that his sons had performed 'wheelies' while riding the ATVs," "he established no rules regarding his sons' use of the ATVs," and "the operation of the ATVs was not restricted to particular areas on the farm." *Id.* Again, the facts at hand can be easily distinguished. Unlike in *Rios*, the Richardsons did not allow W.S.R. to drive the car. In contrast, the only "duty" that the Richardsons are alleged to have breached is the duty to supervise W.S.R. such that they did not watch him while he was near the RU, which, as discussed, is not cognizable under New York law. Accordingly, any affirmative defenses raised by YFAI and FCA on the theory of negligent supervision are dismissed.

### iii. Assumption of Risk

Plaintiffs argue that the affirmative defense of assumption of the risk is inapplicable to the instant Action. (Pls.' Mem. 16.) The Court agrees. "The doctrine of 'assumption of risk' was abolished by the New York State Legislature as an absolute bar to recovery." *Anonymous v. Simon,* No. 13-CV-2927, 2014 WL 819122, at *4 (S.D.N.Y. Mar. 3, 2014) (citing N.Y. C.P.L.R. § 1411). "The New York Court of Appeals has allowed the narrow use of the defense for sports and recreational activities." *Id.* (quotation marks and citation omitted). Indeed, the New York Court of Appeals has clearly articulated,

> the assumption of risk doctrine is not generally applicable in negligence actions to nullify a defendant's duty, but is appropriately interposed only to shield a defendant from exposure to liability arising from risks inhering in athletic and recreational activities. . . . We have not applied the doctrine outside of this limited context and it is clear that its application must be closely circumscribed if it is not seriously to undermine and displace the principles of comparative causation.

*Trupia ex rel. Trupia v. Lake George Cent. Sch. Dist.*, 927 N.E.2d 547, 548–549 (N.Y. 2010) (citations omitted); *see also Zhou v. Tuxedo Ridge, LLC*, 119 N.Y.S.3d 251, 255 (App. Div. 2020) (noting that the doctrine applies to "sporting and amusement activities" (quotation marks and citations omitted)).

However, even if the doctrine was applicable to the instant Action, the Court finds that it would fail. "It has long been settled in New York that an infant is expected to exercise a level of care commensurate with his age, experience, intelligence and ability." *Banks*, 969 F. Supp. at 893 (quotation marks and citation omitted). "The age of the plaintiff is a factor in determining whether they are capable of assuming risk of their actions." *Difrancesco v. Win-Sum Ski Corp.*, No. 13-CV-148, 2017 WL 1046741, at *4 (W.D.N.Y. Mar. 20, 2017) (citations omitted). New York Courts have held, for example, "that the assumption of risk doctrine did not apply to injuries suffered by a six-year-old child who was burned when he climbed over a fence to investigate the defendant's steam hose located near a playground." *Clark v. Interlaken Owners, Inc.*, 770 N.Y.S.2d 58, 60 (App. Div. 2003) (citing *Roberts v. N.Y.C. Hous. Auth.*, 685 N.Y.S.2d 23 (App. Div. 1999)). Similarly, in *Clark*, the court found that the doctrine did not apply to a five-year-old child whose finger was crushed while he was playing on construction equipment belonging to the defendants. *Id.* at 59–60. In *Trupia*, in which the New York Court of Appeals found that an eleven-year-old child did not assume the risk of sliding down a banister at school, the court noted:

> We do not hold that children may never assume the risks of activities, such as athletics, in which they freely and knowingly engage, either in or out of school—only that the inference of such an assumption as a ground for exculpation may not be made in their case, or for that matter where adults are concerned, except in the context of pursuits both unusually risky and beneficial that the defendant has in some nonculpable way enabled.

*Trupia*, 927 N.E.2d at 550.

Here, FCA and YFAI do not appear to dispute that W.S.R., who was nine-years old, was injured while cleaning the RU.  (Fogel Decl. in Supp. of Pls.' Mot. I Ex. U, at 29:1–16 (Dkt. No. 231-20.))  W.S.R.'s actions appear to be similar to those in *Trupia* or *Clark*—that is, the danger associated with cleaning the console of a car would be "unappreciated" to a nine-year-old. *Clark*, 770 N.Y.S.2d at 60.  As the court in *Trupia* observed, "[c]hildren often act impulsively or without good judgment," *Trupia*, 927 N.E.2d at 550, and in this situation, the risk of danger was particularly opaque.  Accordingly, FCA and YFAI's affirmative defenses predicated on W.S.R.'s assumption of the risk are dismissed.

\*       \*       \*

In sum, because the Court has found that Plaintiffs are entitled to summary judgment on FCA and YFAI's affirmative defenses based on the theories of 1) parental comparative negligence, 2) failure to supervise, and 3) assumption of the risk, the Court dismisses the following affirmative defenses: YFAI's First (culpable conduct), Sixth (misuse), Fifteenth (failure to use parking brake), and Sixteenth (parental failure to supervise) affirmative defenses; and FCA's First (misuse), Third and Fourth (culpable conduct), and Fourteenth (failure to use parking brake) affirmative defenses.  (FCA Answer ¶¶ 153, 155–56, 166; YFAI Answer 13–15.)

### 3.  FCA's Motion for Summary Judgment

FCA moves for summary judgment on its Motion for contractual defense and indemnity against YFAI.  (*See generally* FCA's Mem.)[30]

---

[30] As stated above, AJJ has been dismissed from the Action.  Therefore, while FCA also moved for summary judgment against AJJ, the Court does not discuss AJJ in this context.

a.  Applicable Law

"In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state, which is New York in this instance." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) (citation omitted).  "Subject to certain exceptions, New York choice-of-law rules honor parties' decisions to choose one jurisdiction's law to govern a contract."  *Dukes Bridge, LLC v. Sec. Life of Denver Ins. Co.*, No. 10-CV-5491, 2020 WL 1908557, at *33 (E.D.N.Y. Apr. 17, 2020) (citation omitted), *aff'd*, No. 20-2687, 2021 WL 5986871 (2d Cir. Dec. 17, 2021); *see Freedman v. Chem. Const. Corp.*, 372 N.E.2d 12, 15 n.* (N.Y. 1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored.  It is as though the law of the selected jurisdiction were incorporated into the agreement by reference." (citations omitted)); *see also Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994) (following *Freedman*).  For that reason, the Second Circuit has held that "[a]bsent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction."  *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) (citation omitted).  In other words, "New York law allows a court to disregard the parties' choice when the most significant contacts with the matter in dispute are in another state."  *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (quotation marks and citation omitted).

The contracts at issue were all issued in the state of Michigan, to the Parties' subsidiaries in Michigan, and provided for services to be rendered in Michigan.  (Graber Decl. Ex. D. (Dkt. No. 244-4), at 2 (listing FCA US in Michigan as well as YFAI in Michigan for FCA PO 48200015); Graber Decl. Ex. M. (Dkt. No. 244-10), at 2 (same).)  Moreover, the LOI merger

agreement was similarly executed in Michigan amongst Michigan-based parties.  (*See* Fogel

Decl. in Supp. of FCA's Mot. Ex. AG (Dkt. No. 243-32) at 2–3 (listing Johnson Controls in

Michigan as well as FCA).)  Therefore, a contract-based dispute—i.e., a dispute that, while

arising as a consequence of the accident, concerns *only* the contracts at issue—is appropriately

connected to Michigan, and the Court applies Michigan law.  *See Nike USA, Inc. v. Oberg*, No.

20-CV-5784, 2022 WL 1597404, at *2 (E.D.N.Y. May 19, 2022) (applying Oregon law because

the agreements at issue "state that they are governed by the laws of the State of Oregon"); *Rivera*

*v. Home Depot, U.S.A., Inc.*, No. 16-CV-7552, 2021 WL 1530051, at *5 (S.D.N.Y. Apr. 19,

2021) (applying Georgia law for all contract-based disputes); *DiMaria v. Goor*, No. 09-CV-

1011, 2012 WL 541425, at *3 (E.D.N.Y. Feb. 21, 2012) (applying New Jersey contract law as

stated in an agreement).

　　　Michigan law holds that "[u]nder ordinary contract principles, if contractual language is

clear, construction of the contract is a question of law for the court."  *Meagher v. Wayne State*

*Univ.*, 565 N.W.2d 401, 415 (Mich. 1997) (citation omitted).  "The cardinal rule in the

interpretation of contracts is to ascertain the intention of the parties. . . . To arrive at a proper

interpretation of particular language, the entire contract must be considered."  *Klever v. Klever*,

52 N.W.2d 653, 656–57 (Mich. 1952) (quoting *McIntosh v. Groomes*, 198 N.W. 954, 955 (Mich.

1924)).  The Supreme Court of Michigan "has generally observed that '[i]f the language of the

contract is clear and unambiguous, it is to be construed according to its plain sense and meaning;

but if it is ambiguous, testimony may be taken to explain the ambiguity.'"  *City of Grosse Pointe*

*Park v. Michigan Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (alteration in

original) (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 132 N.W.2d 66, 68 (Mich. 1965)).

Finally, a "contract is ambiguous when its provisions are capable of conflicting interpretations."

*Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003) (quoting *Farm*

*Bureau Mut. Ins. Co. v. Nikkel*, 596 N.W.2d 915, 919 (Mich. 1999)).

      "Contractual indemnity is an area of law guided by well-settled general principles."

*Grand Trunk W. R.R. v. Auto Warehousing Co.*, 686 N.W.2d 756, 761 (Mich. Ct. App. 2004).

Indeed, contractual agreements for indemnity are enforceable to the same extent as other

contracts.  *See Hubbell, Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 642 N.W.2d 700, 702

(Mich. 2001) (per curiam).  With that said, "indemnity contracts are construed strictly against the

party who drafts them and against the indemnitee." *Sherman v. DeMaria Bldg. Co.*, 513 N.W.2d

187, 190 (Mich. Ct. App. 1994).  Nevertheless, "it is also true that indemnity contracts should be

construed to give effect to the intentions of the parties." *Id.*  Pursuant to this interpretive

principle,

> Michigan courts have discarded the additional rule of construction that indemnity
> contracts will not be construed to provide indemnification for the indemnitee's own
> negligence unless such an intent is expressed clearly and unequivocally in the
> contract. . . . Instead, broad indemnity language may be interpreted to protect the
> indemnitee against its own negligence if this intent can be ascertained from "other
> language in the contract, surrounding circumstances, or from the purpose sought to
> be accomplished by the parties."

*Id.* at 596–97 (citations and quotation marks omitted).  In sum, "[w]here parties have expressly

contracted for indemnification, 'the extent of the duty must be determined from the language of

the contract.'" *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014)

(quoting *Grand Trunk W. R.R., Inc.*, 686 N.W.2d at 763).

### b.  Application

      The language of the contracts' indemnification provision does not clearly, unequivocally,

or unambiguously express an intent to indemnify FCA for its own negligence.  The contract

states that the "Seller"—here, YFAI by virtue of the merger agreement:

will defend, indemnify, and hold [FCA] . . . harmless against all claims, suits, actions[,] or proceedings . . . for injury for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission[,] or negligent work *of Seller* or its employees, agents, or subcontractors in connection with performing the Order, either on [FCA's] property or in the course of their employment.

(YFAI's 56.1 ¶ 16 (emphasis added); Pls.' Resp. to YFAI's 56.1 ¶ 16 (emphasis added); FCA's Resp. to YFAI's 56.1 ¶ 16 (emphasis added).)  In other words, "[i]t does not state in clear and unequivocal terms any intent on the part of [Seller] to indemnify [FCA] for the latter's own negligence." *Palomba v. City of East Detroit*, 315 N.W.2d 898, 902 (Mich. Ct. App. 1982).

As made clear, the modifying clause—"of Seller," (Giannetta Decl. Ex. T, at 8 (Dkt. 250-41))—"appear[s] . . . at the end of a single, integrated list." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 345 n.4 (2005) (explaining that "the last antecedent inference" is rebutted when "the structure" is such that "[t]he modifying clause appear[s] not in a structurally discrete statutory provision, but at the end of a single, integrated list—for example, 'receives, possesses, or transports in commerce or affected commerce'" (quoting *United States v. Bass*, 404 U.S. 336, 337 (1971))).

Moreover, as noted above, "indemnity contracts are construed strictly against the party who drafts them and against the indemnitee." *Sherman*, 513 N.W.2d at 190.  Absent such a provision obligating YFAI ("Seller") to indemnify FCA for its own negligence, the Court will not read such a provision into the contract.  *See Palomba*, 315 N.W.2d at 902 ("A contract which purportedly indemnifies one against the consequences of his own negligence is subject to strict construction and will not be so construed unless it clearly appears that indemnification for the indemnitee's own negligence was intended." (citing *Gartside v. Young Men's Christian Ass'n*, 274 N.W.2d 58, 60 (1978))).

The question, then, is whether this unfortunate circumstance is solely the fault of FCA, precluding summary judgment.  The Court finds that a reasonable juror could so find.  Without a doubt, YFAI was intimately involved in the design and manufacturing process.  (*See* Mitchell FCA Decl. Ex. H, at 65 (Dkt. No. 241-8) (naming the supplier contact as a YFAI employee).) However, the DVP&R outlays testing responsibilities, stating clearly that the ultimate responsibility fell to FCA, (*Id.* (listing two FCA employees as "owner" and "design responsible").).  FCA's own witnesses confirm this.  (Mitchell FCA Decl. Ex. K, at 32:10–23 (Dkt. No. 241-11) ("The component engineer at FCA's responsibility was to ensure that the development and design of that component met the requirements set forth in the agreement . . . .").)  Moreover, FCA deemed that the MPR testing had passed.  (Mitchell FCA Decl. Ex. H, at 65.)  Accordingly, a reasonable juror *could* find that FCA was solely responsible as the party ultimately overseeing all testing for what would come to pass.  *See Peeples v. City of Detroit*, 297 N.W.2d 839, 842 (Mich. Ct. App. 1980) (finding summary judgment for indemnification improper when there was a question of responsibility for the safety of a job site following an accident thereon); *cf. Pilkington v. Tutor Perini Bldg. Corp.*, No. 17-CV-60, 2020 WL 1285542, at *11 (S.D.N.Y. Mar. 18, 2020) ("The evidentiary record reflects, however, that there is a genuine issue of material fact as to whether [the defendant], through its own negligence, was 100 percent responsible for the fact that the pathway where [the] [p]laintiff fell was obstructed, or whether [the third-party defendant], which may have stored its materials in a manner that caused dunnage to extend into the pathway, was wholly or partially the negligent party.  This disputed issue precludes summary judgment to [the parties] on [the defendant's] contractual-indemnification claims.")

### 4. YFAI's Motion for Summary Judgment

YFAI moves for summary judgment on 1) FCA's third-party claim and crossclaim for contribution, 2) FCA's common law indemnification claim, 3) FCA's breach of contract for failure to procure insurance claim, 4) Plaintiffs' negligence cause of action, and 5) Plaintiffs' strict liability cause of action. (*See generally* YFAI's Mem. 9–10.)

### a. FCA's Contribution Claim

YFAI moves for summary judgment against FCA's third-party claim for contribution, as well as FCA's crossclaim for contribution. (*See generally* YFAI's Mem.)

Because the actions in question giving rise to the contribution claim arise out of actions occurring in Michigan and between parties based in Michigan, Michigan law governs.

"In Michigan, the common law right to contribution is available to tortfeasors who are jointly and severally liable. Two or more persons are jointly and severally liable if their acts concurrently cause a single indivisible injury, even if they do not act in concert." *Fed. Sav. & Loan Ins. Corp. v. Quinlan*, 678 F. Supp. 174, 177 (E.D. Mich. 1988) (citations omitted) (applying Michigan law). Indeed, "[i]n 1970, 'the Michigan Supreme Court expressly created a common law right to contribution among nonintentional tortfeasors, abolishing the former common law bar against such suits.'" *Bajorek-Delater v. United States*, No. 17-CV-10570, 2020 WL 6562255, at *3 (E.D. Mich. Nov. 9, 2020) (quoting *Dolinka VanNoord & Co. v. Oppenheimer & Co.*, 891 F. Supp. 1244, 1248 (W.D. Mich. 1995)). "Third-party plaintiffs may seek contribution from other wrongdoers whose conduct is determined to have contributed to plaintiff's loss, even though third-party plaintiffs' alleged wrongdoing may amount to a breach of fiduciary duty." *Quinlan*, 678 F. Supp. at 177.

60

YFAI argues that "[t]he evidence is abundantly clear that FCA was solely responsible for this accident and is not entitled to any contribution" because 1) FCA's "actions and inaction" are a superseding and/or intervening cause of Plaintiffs' accident, and 2) the MPR cover was altered after manufacture by YFAI.  (YFAI's Mem. 9–10.)  FCA argues in response that YFAI has "misinterpreted" evidence and has not established an intervening act as a matter of New York law.  (FCA's YFAI Opp. 10–16.)

At present, there remains a genuine dispute of fact as to whether FCA is free from active negligence.  Here, "the issue of whether [Plaintiffs were] actively negligent with respect to [W.S.R.'s] injuries has not yet been adjudicated and therefore remains an issue in the case at hand." *Fishbach-Natkin, Inc. v. Shimizu America Corp.*, 854 F. Supp. 1294, 1304 (E.D. Mich. 1994).  A reasonable juror could find several possibilities for potential negligent liability for FCA, spanning from absolute liability, shared liability with YFAI (or others), or no liability, contrary to YFAI's assertions.  Thus, "there remains a genuine issue of material fact as to the parties joint tort feasor status" and YFAI's motion for summary judgment shall be denied.  *Id*. at 1305.

### b.  FCA's Common Law Indemnification Claim

YFAI moves for summary judgment against FCA's third-party claim for common law indemnification based on negligence, a claim for common law indemnification based on strict product liability, as well as a crossclaim for common law indemnification.  (*See* YFAI's Mem. 11–14.)

"'[T]he right to common-law indemnification is based on the equitable principle that where the wrongful act of one party results in another being held liable, the latter party is entitled to restitution.'"  *Despres v. Palmer*, No. 328529, 2016 WL 6138732, at *6 (Mich. Ct. App. Oct.

20, 2016) (emphasis omitted) (quoting *North Community Healthcare, Inc. v. Telford*, 556 N.W.2d 180, 182 (Mich. Ct. App. 1996)).  In other words, it "[i]s the equitable right to restitution of a party held liable for another's wrongdoing." *Id.* (emphasis omitted) (quoting *North Community*, 556 N.W.2d at 182).  The right "exists independently of statute, and whether or not contractual relations exist between the parties, and whether or not the negligent person owed the other a special or particular legal duty not to be negligent." *Dale v. Whiteman*, 202 N.W.2d 797, 800 (Mich. 1972) (citation and quotation marks omitted).

   "It has long been held in Michigan that the party seeking indemnity must plead and prove freedom from personal fault.  This has been frequently interpreted to mean that the party seeking indemnity must be free from active or causal negligence." *Langley v. Harris Corp.*, 321 N.W.2d 662, 665 (1982) (citations omitted).  Therefore, a common-law indemnification action "cannot lie where the plaintiff was even .01 percent actively at fault." *St. Luke's Hospital v. Giertz*, 581 N.W.2d 665, 669 (Mich. 1998); *see also Lakeside Oakland Dev., L.C. v. H & J Beef Co.*, 644 N.W.2d 765, 772 (Mich. Ct. App. 2002) ("[A] party may not seek common-law indemnity where the primary complaint alleges active, rather than passive, liability." (citations omitted)); *Palomba*, 315 N.W.2d at 901 ("Common law indemnification is available only if the party seeking it is not actively negligent.").

   "In Michigan, active negligence occurs when 'a party breaches a direct duty owed to another and this breach is the proximate cause of the other party's injury' while passive negligence occurs when 'the active negligence is attributable solely to another and the liability arises by operation of law.'" *Stewart v. Marathon Petroleum Co., LP*, No. 18-CV-12510, 2020 WL 12763072, at *1 (E.D. Mich. Nov. 3, 2020) (quoting *Feaster v. Hous*, 359 N.W.2d 219, 222 (Mich. Ct. App. 1984)).

62

Under Michigan law, even at the summary disposition stage,[31] determining "whether the indemnitee was 'actively' or 'passively' negligent" first requires "the court [to] examine[]primary [the] plaintiff's complaint." *Feaster*, 359 N.W.2d at 222 (citations omitted); *see also Botsford Continuing Care Corp. v. Intelistaf Healthcare, Inc.*, 807 N.W.2d 354, 361 (Mich. Ct. App. 2011) (stating, upon summary disposition, that "[i]f the primary plaintiff's *complaint* contained any *allegations* of active negligence, rather than merely allegations of passive negligence, common-law indemnification is not available" (emphasis added) (citations omitted)); *cf. Lakeside Oakland*, 644 N.W.2d at 772 (affirming dismissal of indemnification claim upon determination that primary complaint was "premised on active liability").  But "[w]hether a party was free from active negligence in an underlying case and thus entitled to common-law indemnification is generally a question of fact for the jury." *Botsford*, 807 N.W.2d at 360 (citation omitted).  "Such questions may be decided on summary disposition as a matter of law only when reasonable minds could not disagree." *Id.* (citations omitted).  "When there remains a genuine issue of fact as to whether the party seeking common-law indemnification was actively or passively negligent in the underlying case, summary disposition of the common-law indemnification claim is improper." *Id.* (citation omitted).

YFAI's Motion cannot be sustained with respect to common law indemnification. "When the underlying complaint pleads alternative theories of negligence, a court cannot determine whether a claim for common law indemnity against a third party is valid until the parties obtain a judgment on the issue of active versus passive negligence." *Bajorek-Delater*,

---

[31] "Michigan's standards for summary disposition mirror the standards for summary judgment in federal court." *Servs. v. Allstate Ins. Co.*, No. 349786, 2021 WL 406609, at *2 n.1 (Mich. Ct. App. Feb. 4, 2021) (quoting *Estate of Taylor by Taylor v. Univ. Physician Group*, 941 N.W.2d 672, 676 n.2 (Mich. Ct. App. 2019)).

2020 WL 6562255, at *3 (citation omitted) (applying Michigan law for a common law

indemnification claim). As discussed above, there remains a genuine issue of material fact

whether as to whether FCA "was actively negligent in causing the harm alleged by plaintiff." *Id.*

Indeed, a reasonable juror could hold it was not in light of YFAI's involvement in the design,

testing, and manufacturing process, precluding summary judgment. Moreover, that the fact-

intensive nature of FCA's negligence "is generally a question of fact for the jury" such that any

factual dispute renders summary judgment "inappropriate," *Botsford*, 807 N.W.2d at 360, only

bolsters the Court's conclusion. Accordingly, the Court denies YFAI's Motion with respect to

dismissing FCA's claim for common law indemnification.

### c.  FCA's Breach of Contract Claim to Procure Insurance

YFAI moves for summary judgment to dismiss FCA's third-party claims and crossclaims

for breach of contract to procure insurance for FCA. (*See* YFAI's Mem. 14–16.)[32]

FCA argues that it is entitled to indemnification from YFAI and its insurers based on a

contract provision in FCA's Purchase Order 10869201 General T&Cs (9/2010). (FCA's YFAI

Opp. 16–20.) The insurance clause, in relevant part, reads as follows:

> Insurance. Seller will obtain and continuously maintain in force during the Term (i)
> statutory worker's compensation insurance, (ii) employer's liability insurance, (iii)
> commercial general liability insurance, including contractual liability and products
> and completed operations liability, (iv) automobile liability insurance, including
> owned, hired and non-owned liability, (v) crime insurance, including employee
> theft, and (vi) all-risk property insurance covering Seller's property, including
> Tooling and Unpaid Tooling and all Chrysler property, raw materials and finished
> products, including Bailed Property and Chrysler Tooling, while in Seller's
> possession or in Seller's care, custody and control, all in amounts and coverages
> *sufficient to cover all claims hereunder*. . . .

---

[32] Because these claims are born of YFAI and FCA's contract, the applicable law remains
the Michigan contract law as stated *supra* section II.B.3.a.

(YFAI's 56.1 ¶ 15 (emphasis added); Pls.' Resp. to YFAI's 56.1 ¶ 15 (emphasis added); FCA's

Resp. to YFAI's 56.1 ¶ 15 (emphasis added).)

    In pursuing summary judgment on these claims, YFAI argues that whether it obtained

insurance is immaterial, as "the General Terms and Conditions make[] it clear that the supplier

will . . . indemnify for their own negligence and not for FCA's negligence."  (YFAI's Mem. 15.)

In response, FCA cites pending litigation between FCA and two of YFAI's insurers denying

indemnification for products liability related to this action.  (FCA's YFAI Opp. 16–18.)

Contrary to YFAI's claims, indemnification is irrelevant to the instant question.  Whether an

insurer ultimately indemnifies FCA for potential liability is between FCA and those insurers.

The issue before the Court is simply whether YFAI purchased *sufficient* "commercial general

liability insurance" including product liability as required by the General T&C's, which remains

a genuine dispute of fact.

    "The same contract construction principles apply to insurance policies as to any other

type of contract because it is an agreement between the parties."  *Hastings Mut. Ins. Co. v. Safety

King, Inc.*, 778 N.W.2d 275, 291 (Mich. Ct. App. 2009).[33]  In Michigan, a "court must read the

---

[33] While the Parties provided the contracts in full, the Court could not identify a specific
choice-of-law provision and several states are referenced throughout the agreement.  (*See, e.g.*
Giannetta Decl. Ex. Y ("Indian Harbor Policy"), at 26 (Dkt. No. 250-46) (listing Pennsylvania,
Illinois, and Michigan).)  The Court here assumes, without determining, that the insurance
contracts between YFAI and its two insurers are governed by Michigan law because the previous
contracts discussed in this Action were also subject to Michigan law.
    The Court notes that this principle requiring that the Court receive the entire contract
applies in similar jurisdictions, including New York and Texas (where XL Insurance America
Inc. appears to be headquartered).  *See, e.g.*, *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d
Cir. 2009) ("In interpreting an unambiguous contract, the court is to consider its particular words
not in isolation but in the light of the obligation as a whole and the intention of the parties as
manifested thereby . . . ." (alterations, quotation marks, and citation omitted)); *Kass v. Kass*, 696
N.E.2d 174, 180 (N.Y. 1998) ("And in deciding whether an agreement is ambiguous courts
should examine the entire contract and consider the relation of the parties and the circumstances

insurance policy as a whole to determine the parties' intent and give it effect." *Gourmet Deli Ren Cen, Inc. v. Farm Bureau General Insurance Co. of Mich.*, No. 357386, 2022 WL 1714202, at *3 (Mich. Ct. App. May 26, 2022) (citation omitted); *see also Auto Owners Ins. Co. v. Seils*, 871 N.W.2d 530, 539 (Mich. Ct. App. 2015) ("A court must look at the contract as a whole and give meaning to all terms." (quotation marks and citation omitted)).  Despite FCA's claim that YFAI did not purchase product liability coverage, (FCA's YFAI Opp. 17), it is clear from the face of the two relevant insurance contracts that YFAI did indeed purchase products and completed operations liability coverage from XL Catlin ("Indian Harbor") and XL Insurance Company SE – London Branch ("AXA XL").  (*See* Indian Harbor Policy at 28 (identifying a limit for $2,000,000 for "Products – Completed Operations Aggregate Limit"); Giannetta Decl. Ex. Z ("AXA XL Policy"), at 4 (Dkt. No. 250-47) (identifying $5,000,000 "Products Aggregate Limit").)  However, FCA is right that in reading the policies as a whole, the policies do impose various limits upon the products and completed operations liability.  For example, the Indian Harbor policy excludes the following circumstances from its products liability insurance: asbestos, intercompany product suits, lead, and more.  (*See* Indian Harbor Policy at 53, 57, 68.)

    The question at bottom in this breach of contract claim is clear:  Is the insurance that YFAI purchased "sufficient to cover all claims" that may arise from the contract between YFAI and FCA?  FCA unsurprisingly argues that it is not, citing the partial and/or complete denials of coverage by Indian Harbor and AXA XL.  (*See* FCA's YFAI Opp. 16–18.)  It is true that YFAI "may well have breached its obligation to have [sufficient] coverage." (*Id*. at 17.)  However, the

---

under which it was executed." (quotation marks and citation omitted)); *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999) ("In Texas, insurance contract interpretation is governed by general contract interpretation rules.  Our goal is to give effect to the written expression of the parties' intent, viewing the contract *in its entirety*, consistent with applicable rules of law." (emphasis added)).

Court cannot state with the certainty required at summary judgment that these exclusions render YFAI's insurance insufficient, as there is a genuine dispute of fact as to whether YFAI's "coverage[] [is] sufficient to cover all claims." (*Id.*) This is so because there are several relevant issues outstanding, including which company (if any) maintains ultimate liability for W.S.R.'s injuries and the amount of monetary coverage required to "sufficiently" cover FCA. Without this, the Court cannot determine if YFAI breached its contract with FCA, nor can it dismiss FCA's claim on summary judgment. Accordingly, the Court denies YFAI's motion for summary judgment against FCA's breach of contract to procure insurance.

### d.  Plaintiffs' Negligence and Strict Liability Claims

Finally, YFAI moves for summary judgment as to Plaintiffs' claims alleging 1) negligence and 2) strict product liability for a manufacturing defect. (*See* YFAI's Mem. 16–18.) While YFAI fails to specify exactly which products liability negligence theory it disagrees with, this ultimately does not matter for the Court's purposes. Under New York law, negligence and strict products liability analyses are "identical" under a design defect, manufacturing, or failure to warn theory. *See Colon*, 199 F. Supp. 2d at 83 ("Courts have noted that, for the purposes of analyzing a design defect claim, the theories of strict liability and negligence are virtually identical.") (citation omitted); *id*. at 84 ("Failure to warn claims are identical under strict liability and negligence theories of recovery."); *id*. at 85–86 (reiterating the manufacturing defect theory "under either negligence or strict liability"). As such, the Court adopts the reasoning above, *supra* section II.B.2., and denies YFAI's motion for summary judgment on these claims.[34]

---

[34] In arguing against Plaintiffs' negligence cause of action, YFAI states that they owe no duty to Plaintiffs as a "supplier." (YFAI's Mem. 16.) Notwithstanding YFAI's incorrect statement of New York law governing negligence under a theory of products liability, the Court must also note that this argument also likely fails.

III.  Conclusion

For the reasons stated above, AJJ's Motion against Plaintiffs is granted, Plaintiff's

Motion is granted in part and denied in part, FCA's Motion is denied, and YFAI's Motion is

denied.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos.

226, 227, 233, 236, 237, 239, 250).  The Court will hold a status hearing on November 15, 2022

at 11:30am.

SO ORDERED.

DATED:        September 30, 2022
              White Plains, New York

_____

KENNETH M. KARAS
United States District Judge

_____

YFAI is correct that "[l]iability cannot be imposed on a party that was outside the chain of manufacturing, selling, or distributing a product." *Dzhunaydov*, 2016 WL 1069067, at *1 (quoting *Bova*, 761 N.Y.S.2d at 87).  However, YFAI cannot credibly state that it is a party outside of the "distribution chain" of the RU parts, removing any duty to Plaintiffs giving rise to liability. *Finerty*, 51 N.E.3d at 559.  Unlike AJJ, discussed *supra* section II.B.1, YFAI was intimately involved in the in the design of the MPR covers by working with FCA to revise the covers for final approval.  Moreover, *even if* YFAI is properly designated as a supplier, this does not diminish the fact that YFAI *manufactures and supplies* the covers themselves.  YFAI's argument is more properly understood as one disputing ultimate liability under a contribution or indemnification theory, rather than one that eliminates liability all together.  Thus, the Court finds this argument unpersuasive.

68